CRAWLEY, Judge.
B.M. (“the mother”) and M.F. (“the father”) are the unmarried parents of three children, B.R.M. (d/o/b — 01/14/98) (“the oldest child”), I.S.S.M. (d/o/b — 12/27/01) (“the middle child”), and I.C.J.M. (d/o/b— 09/05/03) (“the infant”). In July 1999, the oldest child was removed from her mother’s custody after the Department of Human Resources (“DHR”) was notified by Children’s Hospital that the mother was suspected of perpetrating Munchausen’s syndrome by proxy (“MBP”) abuse upon the oldest child. When the middle child and the infant were born, each was removed from the mother’s custody upon their release from the hospital after birth. After a trial in September 2003, the trial court terminated the parental rights of both the mother and the father to all three children. Both parents appeal.
The facts giving rise to the MBP-abuse allegation are lengthy, beginning with the oldest child’s frequent visits to her pediatrician, Dr. Sesi Ogumbi, and culminating in a fifth hospitalization in Children’s Hospital related to a hematoma in the oldest child’s right thigh. In addition, the oldest child suffered a respiratory arrest during that fifth hospitalization, which led the staff at Children’s Hospital to decide that the case was indeed an MBP-abuse case and to place the oldest child in a special, constantly supervised section of the pediatric unit. Children’s Hospital notified DHR of the suspicion that the mother was a perpetrator of MBP abuse; the oldest child was placed in foster care immediately upon her release from Children’s Hospital. According to Dr. DeeAnne Jackson, an assistant professor of pediatrics at the University of Alabama Birmingham (“UAB”) and a member of the Children’s Hospital Intervention and Prevention Services (“CHIPS”) team; Dr. Richard J. Whitley, a professor of pediatrics at UAB and a member of the CHIPS team; Dr. Marc Feldman, the Medical Director for the Center for Psychiatric Medicine at UAB and an MBP-abuse expert, the MBP-abuse allegation was made after consideration of all of the oldest child’s illnesses and hospitalizations. A discussion of the *322 oldest child’s medical history from March 1999 through her removal from the mother’s custody in July 1999 is necessary; however, we will not recount dn detail the voluminous medical records.

I. The Oldest Child’s Medical Problems

In March 1999,’ the oldest child was hospitalized at Jackson Hospital for bronchitis and pneumonia. During her hospitalization, the oldest child fell from her crib. The récords from the oldest child’s hospitalization indicated that she suffered no injuries from the fall. However, two months later, in early May 1999, the oldest child would not walk on her leg; she was at day care at the time, so the mother was called to retrieve her. The mother described the oldest child’s leg as being swollen, hot, and red. The mother took the oldest child to the emergency room at Baptist Medical Center East (“Baptist East”), where the child was given a shot. The mother said that the oldest child’s leg continued to be warm, .swollen, and red, so on May 6,1999, she took the oldest child to her pediatrician, Dr. Ogumbi, who admitted the oldest child to Baptist East for an aspiration of her knee. The oldest child was hospitalized at Baptist East from May 6 to May 15,1999. During her hospitalization, the oldest child was treated with intravenous antibiotics. When the oldest child’s symptoms continued after her discharge from Baptist East, Dr. Ogumbi was concerned that the oldest child might suffer from osteomyelitis, an infection of the bone or bone marrow. Dr. Ogumbi referred the oldest child to Dr. J. Scott Doyle, a pediatric orthopedist affiliated with Children’s Hospital.
Dr. Doyle admitted the oldest child to Children’s Hospital on May 21, 1999; she was placed on intravenous antibiotic treatment and released on May 26. Dr. Doyle’s discharge summary indicates that the oldest child was admitted to rule out right femur osteomyelitis; her diagnosis at discharge was right thigh cellulitis, an infection of the tissues underneath the skin. According to the discharge summary, the swelling and warmth in the oldest child’s leg was improved at the time of her discharge.
The mother returned the oldest child to the Baptist East emergency room on May 28, 1999, complaining that the oldest child’s leg was again swollen and warm. The oldest child was referred to Children’s Hospital the following morning. According to the hospital records, the oldest child was admitted to Children’s Hospital on May 29; on May 30, her right knee was aspirated. On June 1, 1999, the oldest child was taken to surgery for an exploration of and an incision and drainage of a right thigh hematoma; Dr. Doyle performed the surgery.
On June 7, 1999, the oldest child was again seen by Dr. Ogumbi. At that time, the mother complained that the oldest child was bleeding from the incision site. Dr. Ogumbi contacted Children’s Hospital, which requested that the oldest child return to Children’s Hospital; the oldest child was admitted to Children’s Hospital on June 8, 1999. Dr. Doyle again performed surgery on the oldest child because of what he termed a wound dehiscence, which is essentially a parting of the wound; in this case, the dehiscence was caused by the apparent breaking or removal of one of the sutures in the oldest child’s leg. The oldest child was discharged from Children’s Hospital on June 20,1999. She was to see Dr. Ogumbi and Dr. Doyle on June 25,1999.
The discharge summary for the June 8-20 hospitalization indicated that Dr. Doyle had considered the possibility of MBP abuse on this admission to Children’s Hospital, the oldest child’s second admission to Children’s Hospital, because of the “unusu *323 al nature of the wound dehiscence” and because of her multiple hospitalizations. According to the discharge summary, Dr. Doyle consulted with the CHIPS team and spoke with Dr. Jackson, who interviewed the mother and spoke with Dr. Ogumbi about whether she had any concerns about abuse or neglect of the oldest child by the mother. In addition, the Children’s Hospital Social Services department interviewed the mother and contacted Montgomery County DHR to investigate whether there were any reports concerning the oldest child or the mother. After determining that there were not any concerns or reports about abuse or neglect, the conclusion reached by the CHIPS team was that the child had suffered “one unusual/unexplained injury” but that all of her other hospitalizations had been for common illnesses and that the oldest child otherwise appeared “well-grown and developmentally normal.” Accordingly, the discharge summary indicated that “there was no concern for suspected child abuse or neglect at the time” but that if the oldest child encountered further unexplained illnesses or injuries, the situation would need to be reevaluated.
At the June 25, 1999, office visit to Dr. Ogumbi, the mother again complained that the oldest child’s leg was swollen and that she would not bear weight on her leg. On the same day, the mother also took the oldest child to a clinic in Montgomery where Dr. John Killian, who is also associated with Children’s Hospital, was seeing patients. Dr. Killian reportedly informed the mother that the oldest child would require additional surgery and that she would need to be admitted to Children’s Hospital that day. The oldest child was admitted later that day, and Dr. Killian preformed surgery on the oldest child’s leg the following day. After the surgery was completed, the oldest child’s leg was fitted with a spica cast with a window so that the dressing on the wound could be changed. Because the preferred treatment of the oldest child’s continued symptoms required the use of intravenous antibiotics, Dr. William Hardin, Jr., placed a central line in the oldest child’s subclavian vein. The oldest child was discharged on July 2, 1999, after the mother was taught to administer the antibiotics. In addition, home-health nurses were provided to monitor the oldest child.
The oldest child’s cast and sutures were removed on July 6, 1999, at an orthopedic clinic. The swelling and redness in the oldest child’s right thigh was noted to have decreased. However, on July 8, 1999, the mother again returned the oldest child to Children’s Hospital, again complaining of redness and swelling up the oldest child’s thigh to her buttock. The oldest child was admitted to the hospital and was started on three antibiotics. Testing of the oldest child revealed that she was suffering from anemia at this time. During this hospitalization, the oldest child suffered a respiratory arrest while the mother was reportedly in the bathroom adjoining the oldest child’s room for approximately one and one-half hours giving herself a perm and taking a shower. The oldest child was successfully resuscitated and spent time in the pediatric intensive-care unit on a ventilator.
During this last hospitalization and after her recovery from the respiratory arrest, the oldest child was transferred to a special ward where she and the mother were under constant supervision. During that time the oldest child’s recurrent symptoms — redness and swelling in her thigh— subsided and she became playful and active. Upon her discharge into foster care, the oldest child had no recurring symptoms in her thigh and has suffered only normal childhood illnesses.
*324 II. The Testimony Concerning' MBP Abuse
At the September 2003 trial, DHR presented extensive testimony from two medical doctors on the CHIPS team, Dr. Whitley and Dr. Jackson. In addition,'the trial court heard the testimony of Louisa Lash-er, an MBP abuse expert. Another MBP abuse expert, Dr. Feldman, was unable to testify at trial, but the trial court did have as exhibits his testimony at a previous hearing in October 1999 and his 2001 deposition. The mother presented, via telephone, the testimony of Dr.' Mark A. Whit-more, a physician who practices in internal medicine; his report was also admitted as an exhibit at trial.

A. The Medical Testimony

Dr. Whitley and Dr. Jackson both testified that they had seen what they termed as “red flags” when they first reviewed the oldest child’s medical records. Both indicated that their suspicions were raised by the fact that the oldest child had been hospitalized several times in a few months and that she appeared to recover well in the hospital setting but would relapse and require further hospitalization shortly after returning home in her mother’s care. Both doctors had authored the report sent to DHR indicating that the mother was suspected of perpetrating MBP abuse on the oldest child. Both opined that they could not find a medical cause for the oldest child’s hematoma, the wound dehis-cence, the continued symptoms indicating an infection in the oldest child’s thigh despite the failure of any testing to reveal such an infection, the mother’s insistence that the oldest child required medication for severe asthma, the oldest child’s anemia, or the respiratory arrest the oldest child suffered during her final hospitalization.
In regard to the original appearance of the hematoma, both Dr. Whitley and Dr. Jackson testified that they could find no cause for the wound. Although the mother had reported that the oldest child had fallen from a hospital crib while in Jackson Hospital in March 1999, both doctors stated that a hematoma would form within a day or so of the original injury and that the first sign of anything being wrong with the oldest child’s leg was two months after the fall. According to Dr. Jackson, the conclusion of the CHIPS team was that the hematoma was caused by an intentional trauma to the oldest child’s leg. She admitted that it could have been caused by an unwitnessed accident, but she said that an unwitnessed accident as a cause of the hematoma was unlikely based on the size of the hematoma.
Both Dr. Whitley and Dr. Jackson testified that the recurrent pain, redness, and swelling in the oldest child’s thigh mimicked the appearance of a subcutaneous tissue infection called cellulitis. The testing done during the oldest child’s final hospitalization showed no infection; the oldest child’s white blood cell count was normal and the tissues were not inflamed. According to Dr. Jackson, she had discussed with a pathologist who examined the oldest child’s tissue samples whether the antibiotic treatment the oldest child had undergone could have resolved the infection, thus explaining why the tests revealed no infection. She said that the pathologist did not believe that antibiotic treatment had resolved an infection because, in the pathologist’s opinion, the tissues should still have shown inflammation. According to Dr. Whitley, the symptoms of cellulitis can be induced by using a heating pad to heat the skin and tissue, by abrading the skin, or by injecting something into the skin. Dr. Jackson- also mentioned that a thermal tissue injury such as a low-grade burn would recreate the symptoms and appearance of cellulitis. On cross-exami *325 nation, Dr. Whitley was asked whether the application of heat to the skin would need to have been applied on a consistent basis to cause symptoms similar to cellulitis; he replied, “[W]e would have thought so, but I can’t say for sure what would happen in each individual episode.”
Dr. Jackson also discussed the fact that the mother had reported that the oldest child suffered from severe asthma requiring the use of aerosol medications. According to Dr. Jackson, the oldest child’s medical records from her several hospitalizations showed two indications that she was heard wheezing. In addition, Dr. Jackson said that she spoke with Dr. Ogumbi about the oldest child’s diagnosis and that Dr. Ogumbi said that she had never heard the oldest child wheeze. Dr. Jackson said that the oldest child’s medical records indicated that she might suffer from mild asthma, but not a severe case requiring the amount of medication the mother said the oldest child required. Dr. Jackson concluded that the mother exaggerated the oldest child’s ailment or, perhaps, that the mother misunderstood Dr. Ogumbi’s instructions regarding the medication.
Dr. Whitley briefly discussed the dehis-cence of the oldest child’s surgical wound. He explained that the oldest child’s sutures, which at times were referred to as staples, should not have opened easily. Although he admitted that the oldest child could have picked at the wound enough to open a suture, he said it would have been painful to the oldest child. He said that he recalled seeing the dehiscence and that he believed that it was three to four centimeters long. When confronted with the fact that the operative report indicated that the wound was three to four millimeters long, Dr. Whitley pointed out that the writing on the report was not entirely clear and that he was not sure that it really said “mm.” for millimeters. He also said that he had not measured the wound dehiscence and that he doubted that the treating physician, Dr. Doyle, had either.
Dr. Jackson and Dr. Whitley both testified that the oldest child’s respiratory arrest was unexpected. According to Dr. Jackson, most respiratory arrests in children can be expected due to their clinical course; however, she stated that the oldest child’s clinical course did not suggest that she was at risk for respiratory arrest. Dr. Whitley said that the CHIPS team considered whether the respiratory arrest could have been caused by the oldest child’s choking on some food and aspirating but that it found no evidence of that. According to Dr. Jackson, the lack of any food or milk in the oldest child’s airway during intubation supported the conclusion that the oldest child had not choked on food and aspirated. In addition, Dr. Whitley said that the chances of a respiratory arrest in a normal child suffering the symptoms that brought the oldest child to the hospital were “virtually zero.” Both doctors opined that the respiratory arrest was caused by an intentional act, i.e., suffocation.
Finally, both doctors stated that the oldest child’s anemia during her last hospitalization was determined to have been caused by the mother’s intentional withdrawal of the oldest child’s blood from the oldest child’s central line. Dr. Jackson explained that the hematologist could find no reason for the oldest child’s anemia and that it resolved once the oldest child was placed in a supervised setting. Dr. Whitley said that the oldest child’s hematocrit level had been stable and that it had not varied during her stays in the hospital. However, Dr. Whitley said that, upon the oldest child’s last admission to the hospital, her hematocrit level was significantly lower. Dr. Whitley stated: “That doesn’t *326 happen for an unexplained reason, and we couldn’t explain it.”
Based on the CHIPS team’s conclusion that the oldest child’s medical ailments were either exaggerated by the mother or caused by the mother and not by a medical condition, Dr. Whitley and Dr. Jackson concluded that the mother was perpetrating MBP abuse upon the oldest child. They confirmed- their diagnosis by placing the oldest child in a ward where she and the mother would be closely supervised, and the oldest child, as expected, improved dramatically. In fact, all of her symptoms resolved. -At-this point, DHR removed the oldest child from the mother’s care and placed her in-foster care.
The mother presented the report and the testimony of Dr. Mark A. Whitmore. Dr. Whitmore questioned the CHIPS team’s determination that the only cause for the oldest child’s hematoma and recurrent symptoms was the mother’s intentional conduct. He opined that the fall from the hospital bed in March 1999 could have caused the hematoma, statirig that the bruise might not have been noticeable immediately. In addition, he refuted the claim that the mother caused the oldest child’s anemia by withdrawing blood from the oldest child’s central line, stating that the mother would ■ likely have needed a special syringe, would have had to flush the line afterward with a special solution, and that, even if the flushing was done properly, the likelihood of clotting in the line was high. Because the medical records did not indicate that the oldest child had any problems with her central line, Dr. Whitmore concluded that it was very unlikely that the mother withdrew blood from the oldest child’s central line. Dr. Whitmore also took issue with the conclusion that the mother had produced the symptoms of cellulitis in the oldest child’s thigh. According to Dr. Whitmore, the early treatment of the oldest child’s hema-toma and cellulitis infection were marked by some poor antibiotic choices and incomplete treatment.
For example, Dr. Whitmore criticized the choice of Rocephin for the first antibiotic treatment, stating that it was not an optimal choice for the type of infection the oldest child appeared to have. In addition, Dr. Whitmore concurred with an infectious-disease consult that appeared in the oldest child’s medical records recommending a three-week course of intravenous antibiotics; although the oldest child received intravenous antibiotics on at least two hospitalizations, she never received the recommended three-week course. Dr. WhitmOre opined that the oldest child’s relapses were the result of a partially resolved infection that would relapse once the oldest child was off of the intravenous antibiotics long enough. He concluded that “the relapses after discharge have explanations that are at least clearly possible, and I feel that the explanations are not only adequate, but are much more likely than anything [the mother] could have done.” He also commented that “[m]ost significantly, I cannot think of any possible way this type of injury [referring to the cellulitis] could be intentionally caused by the mother without external evidence of trauma, especially on a repetitive basis. I feel it is completely incorrect to blame the mother for an unexplained illness when one cannot explain just how the mother could have caused the illness, especially multiple times, without leaving any evidence that she did so.” Dr. Whitmore opined that the conclusion that the mother had perpetrated MBP abuse was not adequately supported by the oldest child’s medical records.

B. Expert .Testimony on MBP Abuse

As noted above, DHR presented the testimony of two MBP-abuse experts, Dr. *327 Marc Feldman and Louisa Lasher. Dr. Feldman, a psychiatrist who testified at a hearing held in October 1999 and who was deposed in October 2001, was no longer practicing medicine at the time of the trial, having notified the court in May 2002 that he was medically disabled as a result of what his physician called work-related major depression. Ms. Lasher is an MBP expert, but she does not hold a counselor’s or social worker’s license and is not a psychiatrist, psychologist, or other medical professional. She is, however, “license eligible” for a counseling license.
The testimony of both Dr. Feldman and Ms. Lasher was consistent. Dr. Feldman and Ms. Lasher explained that MBP abuse is a form of child abuse in which the perpetrator either exaggerates or creates an illness or injury in another person in order to receive attention for himself or herself. Both experts opined that the medically unexplained nature of the oldest child’s symptoms, her repeated hospitalizations during which she would improve, and her relapses after discharge served as a basis for considering whether the mother was an MBP-abuse perpetrator.
Both experts explained that the “separation test” was a useful tool in confirming suspected MBP-abuse cases. In a separation test, the victim is separated from the perpetrator. In this case, the first step of the separation test was to place the mother and the oldest child in a closely supervised ward where the mother was not left alone with the oldest child. During this approximate 10-day period, the oldest child’s health improved remarkably. After this initial separation test confirmed the suspicions of Dr. Whitley and Dr. Jackson, DHR took custody of the oldest child and placed her in a foster home. She has not had any recurrence of her symptoms and has suffered only a few minor childhood ailments since her removal from the custody of the mother. This fact, according to both Dr. Feldman and Ms. Lasher, is as close to conclusive proof as is typically available in an MBP-abuse case. Dr. Feldman and Ms. Lasher both advised the court that they had concluded that the mother had committed MBP abuse in this case.
Both Dr. Feldman and Ms. Lasher readily admit that a “smoking gun” is almost never present in an MBP-abuse case; in essence, the “diagnosis” is one of exclusion — when the medical professionals cannot explain a patient’s illness or injury, MBP abuse may be suspected. Interestingly, both Dr. Feldman and Ms. Lasher testified that a psychological examination is not helpful in determining whether a person might be an MBP-abuse perpetrator. In fact, MBP abuse is not a formal mental-health diagnosis and is not included in the Diagnostic and Statistical Manual of Mental Disorders IV. According to both Dr. Feldman and Ms. Lasher, an MBP-abuse perpetrator may or may not have any particular psychological disorders or personality traits.[1]
*328 In addition, both Dr. Feldman and Ms. Lasher stated that the siblings of MBP-abuse victims are at great risk if they are left in the care of the MBP-abuse perpetrator. Likewise, both stated that placement with relatives who do not believe that the MBP-abuse perpetrator has committed the alleged abuse is not acceptable because it places the children at great risk as well; both stated that a person who does not believe the abuse occurred will not be able to adequately protect the children and may even, unwittingly, aid the perpetrator in continuing the abuse. Ms. Lasher recommended that the parental rights of both the mother and the father to all three children be terminated.

III. Testimony Concerning Alternative Placements

As noted above, both Dr. Feldman and Ms. Lasher testified that placement of MBP-abuse victims with relatives was not acceptable in most cases because of the risk that the victim would be subjected to further abuse. As this case progressed, however, DHR considered and ultimately rejected several potential relative placements for the children. Chief among the reasons for ruling out relative placements was the opinion of both Dr. Feldman and Ms. Lasher that such alternative placements seldom worked out because the relative often could not believe that the child was harmed by the MBP-abuse perpetrator and would eventually, despite assurances to the contrary, allow contact between the child victim and the perpetrator.
Among those considered as a possible placement resource was D.J., the mother’s aunt. D.J., in fact, was given supervised and then unsupervised weekend visits with the oldest child[2] until an article featuring a photograph of the mother and the oldest child appeared in the Montgomery Advertiser. Although D.J. denied having allowed the mother to visit with the oldest child while the oldest child was visiting D.J.’s home, no alternative theory on how the mother and the oldest child were photographed together was advanced and DHR terminated D.J.’s visits with the oldest child. D.J. testified at trial, stating that she would like to be considered for placement and that she could abide by any court order restricting the mother’s contact with the children. She stated that “she did not know” if the mother had committed the abuse.
The mother’s “mother,” A.M., in whose home the mother had resided from the time she was approximately 17 years old until approximately the year 2000, testified that she did not believe that the mother had done anything to hurt the oldest child. She said that she would, however, do whatever was required of her by court order were she granted custody of the children.
T.F., the father’s mother, testified that she never suspected that the mother had harmed the oldest child; she said that she did not believe it even at the time of trial. She mentioned the fact that the mother had been left alone with young nieces and nephews and that she had never harmed those children. She said she thought the father could raise the children and that she would be available to help him as needed. She also said that she would help him enforce any restrictions placed on the mother’s contact with the children. She also said that she would like to be considered for placement. T.F. testified that she has two adult sons, a granddaughter, and two great-grandchildren already living with her in her four-bedroom home.

*329
IV. The Testimony of the Parents

The mother’s testimony was lengthy. In short, she denied that he had ever harmed the oldest child in any way. She said she would never admit that she was an MBP-abuse perpetrator and that she thought that Children’s Hospital had made the accusation because one or more of the doctors had committed malpractice in his treatment of the oldest child. When asked about the father, the mother explained that she had once accused the father of domestic violence. She said that she lied about the incident at the urging of a friend to “get back” at the father. She said that she and the father planned to marry.
The mother said that the father had told her that he did not think DHR would give him custody even if he was separated from her because he will not agree with them that she hurt the oldest child. The mother supported T.F., D.J., and A.M. as placement alternatives. She also mentioned several other relatives as placement alternatives, stating that she would not go to their homes were they awarded custody of the children.
The father testified that he does not believe that the mother harmed the oldest child. He also said that he realized that if he continued his relationship with the mother he would not be awarded custody of the children; he said that he wanted to rear the children with the mother. However, he did testify that he would separate from the mother if that was the only way to prevent termination of his parental rights. He also supported T.F., D.J., and A.M. as possible placement alternatives. The father denied that he had ever committed domestic violence upon the mother, and, in fact, he does not believe that the mother reported that he committed violence to others. He did admit, however, to a prior drug-related conviction; he also testified that he was a recovering narcotics addict who had been “clean” for three years.

V. The Testimony of DHR Personnel

Nancy Guilford, who was the family-options caseworker that investigated child-abuse and neglect reports in 1999, testified that she received the report from Children’s Hospital concerning the suspicion that the mother had perpetrated MBP abuse on the oldest child. Ms. Guilford said that she sought an immediate pick-up order and that she then began an investigation. During her investigation, she spoke with the mother, the father, the mother’s “mother” A.M., Dr. Ogumbi, and the home-health nurse who had assisted the mother in administering intravenous antibiotics through the oldest child’s central line while the oldest child was at home. Ms. Guilford testified that she did not consider relative placement for the oldest child when she was first brought into DHR’s care because the plan was to continue the separation test to be sure that the oldest child improved when out of the mother’s care.
Sheila Hawkins was the oldest child’s caseworker from October 1999 through at least February 2002 (she wrote the February 2002 court report, but it is unclear at what time she ended her tenure as the child’s caseworker). She testified that she had considered several relatives as possible placement alternatives during her tenure as the oldest child’s caseworker. She said that serious consideration was given to D.J., who at one time had unsupervised weekend visitation with the oldest child. Ms. Hawkins explained that D.J. had withdrawn her petition for custody after DHR terminated her visits with the oldest child as a result of the newspaper photograph. Ms. Hawkins testified that she had also had a home study performed on I.H., a relative of the mother, but that the home study was unfavorable due to I.H.’s health *330 problems. According to Ms. Hawkins, the home study on A.M. was favorable, but Hawkins said that A.M. was rejected as a suitable placement because she did not believe that the mother had perpetrated MBP abuse on the oldest child, Likewise, T.F., the father’s mother, was similarly rejected because she did not believe the mother had abused the child. According to Ms. Hawkins, this lack of belief that the mother had abused the oldest child is a problem because the children need to be placed in an environment where they will be protected.
Ms. Hawkins said that she also contacted the mother’s brother, J.O., who indicated that he might be interested in being a relative placement; however, he failed to respond to certified letters or to set up a home study. According to Ms. Hawkins, the mother’s sister, T.M., and the father’s brother, Mi.F., said that they were not financially able to take on the added expenses of two children[3] in addition to the expenses of their own families. Finally, Ms. Hawkins reported that the home studies of two of the mother’s uncles, J.P. and S.P., were unfavorable.
When questioned about whether DHR would consider the father suitable for custody if he were not living with the mother, Ms. Hawkins replied that he would not be suitable. She listed other issues that DHR considered as problems with the father’s suitability for custody, including the issue of domestic violence, his prior drug-related conviction,. and his pattern of inconsistent visitation with the children. In addition, Ms. Hawkins said that the father refused to believe that the mother had abused the oldest child and that she did not think he would protect the children from her.
Christian Silva, the children’s caseworker from June 2003 to the termination hearing, had reviewed the case file and tried to contact the potential relative placement alternatives named in the file. She said that the only person she was able to reach was T.M., the mother’s sister, who still declined to take the children. She also testified that the mother loved the children, that the father loved the children, and that the children appeared attached to the mother.

VI. The Termination-of-Parental-Rights Standard

“The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent’s custody would be in the child’s best interests, but the primary consideration in any proceeding to terminate parental rights is always the best interests and welfare of the child. In making, that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala. Code 1975,] § 26-18-7(a)....”
Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted).
*331 A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990). A juvenile court’s decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
A court may terminate parental rights when “the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child ... and ... such conduct or condition is unlikely to change in the foreseeable future.” Ala. Code 1975, § 26-18-7(a). Sections 26-18-7(a)(1) — (6) and (b)(l)-(4) list factors a trial court must consider in making the difficult decision whether to terminate parental rights. Among those factors are whether the parent has abused the child, § 26-18-7(a)(3), and whether the child has suffered an unexplained serious physical injury under circumstances indicating that the injury resulted from the parent’s intentional conduct or willful neglect § 26-18-7(a)(5). Although DHR is generally required to undertake reasonable efforts to reunify children in foster care with their parents, see Ala.Code 1975, § 12-15-65(g)(3), reasonable efforts are not required in certain circumstances, including situations where a parent has subjected the child to abuse. Ala.Code 1975, § 12-15-65(m)(l). In addition, “[njothing in the exceptions to making reasonable efforts ... shall be interpreted to require the reunification of a child with a stepparent or paramour of a parent under similar circumstances.” § 12-15-65(m).

VII. The Mother’s Arguments

The mother makes several arguments in her brief on appeal. She first argues that the trial court denied her due process and abused its discretion when it considered at the termination hearing the testimony of Dr. Marc Feldman given at the “custody” hearing held on October 1, 1999, because the mother did not cross-examine Dr. Feldman at that hearing. She further argues that the trial court erred in relying upon Dr. Feldman’s October 1999 testimony when the “exhibits” from that hearing are not contained in the record. The mother also argues that the trial court erred in terminating her parental rights to the infant because the trial court failed to hold a 72-hour hearing and because ho petition to terminate her rights as to the infant was ever filed. The mother’s final two arguments are that the trial court erred by failing to enter a summary judgment in her favor and that the trial court’s judgment is not supported by clear and convincing.evidence.

A. The Arguments Concerning the Admission of Dr. Feldman’s Testimony

The mother’s first argument concerns the admission óf a transcript of the testimony of Dr. Marc Feldman given at a hearing held on October 1, 1999. At the October 1999 hearing, the mother was represented by Sterling Frith. Because Frith had recently been appointed,[4] he declined to cross-examine Dr. Feldman. At the *332 close of Feldman’s testimony, the court noted that “[c]ross-examination will be subject to ... it’s going to be up to counsel for the mother after he has had an opportunity to review all the depositions.” Frith was replaced by another attorney before he ever requested to cross-examine Dr. Feldman. None of the mother’s attorneys since that date (there were five) ever requested that Dr. Feldman be recalled for the purpose of cross-examination. In October 2001, Dr. Feldman was deposed; the mother’s attorney at that time, David Smith, cross-examined Dr. Feldman at that deposition. The transcript of Dr. Feldman’s October 1999 testimony was admitted without objection at the termination trial. As DHR notes in its brief, a trial court will not be held in error on an argument not raised before it, Ex parte Linnell, 484 So.2d 455, 457 (Ala.1986), and the law is well-settled that an appellate court will not consider on appeal the admission of evidence to which no objection was made. Costarides v. Miller, 374 So.2d 1335, 1336 (Ala.1979); J.W. v. D.W., 835 So.2d 206, 211 (Ala.Civ.App.2002) (quoting M.W. v. State, 571 So.2d 361, 362 (Ala.Crim.App.1990)(noting that “[e]ven in juvenile cases, proper and timely objections are required”)).
The mother makes a second argument concerning the admission of Dr. Feldman’s October 1999 testimony. She says that the exhibits from the October 1999 hearing that were “referenced and discussed” with Dr. Feldman during his testimony are missing from the record; therefore, she concludes, she was prejudiced in her ability to respond to DHR’s allegations. However, the only exhibit mentioned in the transcript is a copy of Dr. Feldman’s report to DHR, which Dr. Feldman testified about at great length and in detail. Although a copy of that exhibit does not appear to have been appended to the copy of Dr. Feldman’s October 1999 testimony admitted as DHR exhibit 5, the record contains two copies of that report. Therefore, assuming that the DHR’s failure to attach the report - as an exhibit to the transcript of Dr. Feldman’s October 1999 testimony was error, we fail to find any prejudicial error in that omission. Rule 45, Ala. R.App. P.

B. The Arguments Concerning the Procedure in the Case Involving the Infant

The mother’s third and fourth arguments are based on procedural errors in the case number JU-2003-1091, involving the infant. Specifically, the mother argues that the trial court failed to hold the required 72-hour hearing and that the trial court erred in terminating her parental rights to the infant because DHR never filed a termination petition relating to the infant. The infant, as noted above, was born on September 5, 2003, only 10 days before the termination hearing regarding the oldest child and the middle child. The case action summary sheet for the case involving the infant indicates that a 72-hour hearing on DHR’s pick-up order was set for September 8, 2003, at 11:00 a.m. The case action summary sheet reflects that the mother and her attorney were present on September 8, 2003, but that the mother objected to the case being heard by the juvenile referee at that time, requesting instead that the case be heard by the circuit judge. The case action summary sheet then reflects that on September 9, 2003, the hearing was reset before the circuit judge; the new date for the hearing was September 15, 2003 — the date on which the termination petitions regarding the oldest child and the middle child were scheduled to be heard. Also on September 9, 2003, the trial court entered an order making the infant a party to his siblings’ cases; the order noted that the *333 siblings’ cases were to be heard on September 15, 2003.
The mother’s objection to the referee presiding over the 72-hour hearing regarding the infant prevented DHR from securing a hearing on the pick-up order within 72 hours. The mother did not object to the 72-hour hearing being reset to the same day as the termination hearing regarding the oldest child and the middle child or to the infant’s being “made a party” to the termination cases involving his siblings. Although the mother was not afforded the statutorily mandated hearing within 72 hours, the mother and not the trial court was the cause of the failure. In addition, the mother’s failure to object to the trial court’s resetting of the hearing for September 15, 2003, and her failure to raise this issue to the trial court at any time prevents this court from considering this issue. Ex parte Linnell, 484 So.2d at 457 (noting that “the rule against raising an issue for the first time at the appellate level applies even if the issue raised would present constitutional questions”); J.W., 835 So.2d at 212.
Likewise, the mother’s argument that DHR’s failure to file a termination petition regarding the infant was not preserved for our review. The mother failed to object to the termination of her rights as to the infant in a postjudgment motion (the mother filed only a motion for a stay after the termination judgment). The mother never objected to any testimony concerning the risk of harm to the oldest child’s siblings — the middle child and the infant — if they were returned to the mother’s care. Therefore, we cannot consider the mother’s argument that the failure to file a termination petition is fatal to DHR’s case concerning the infant.[5] Ex parte Linnell, 484 So.2d at 457; J.W., 835 So.2d at 212.

C. The Argument Concerning the Denial of the Mother’s Summary-Judgment Motion

The mother also argues that the trial court erred by failing to grant her motion for a summary judgment. The denial of a summary-judgment motion is not appealable. Superskate, Inc. v. Nolen, 641 So.2d 231, 233 (Ala.1994). In general, an appellate court will not review the denial of a summary judgment motion after a trial on the merits. Mitchell v. Folmar & Assocs., 854 So.2d 1115, 1116 (Ala.2003); Superskate, 641 So.2d at 234 (stating that such a review would occur only in a rare case). Therefore, we will not address the mother’s argument that the trial court erred by not entering a summary judgment in her favor.

*334
D. The Argument Concerning the Sufficiency of the Evidence

The mother’s final argument is that the trial court’s judgment terminating her parental rights is not supported by clear and convincing evidence. The trial court found that the mother had perpetrated MBP abuse upon the oldest child and that she was not presently, and would not in the foreseeable future be, able to provide a fit home for the children. As noted above, the testimony of several doctors and two experts on MBP abuse indicated without reservation that the oldest child’s medical problems in the spring and summer of 1999—the recurrent symptoms in her thigh, her anemia, and the respiratory arrest—were not traceable to a medical cause or condition. The MBP-abuse experts testified that the mother’s refusal to admit the abuse and the nature of MBP abuse made reunification a risky proposition for both the oldest child and her younger siblings. Although the mother presented testimony from Dr. Whitmore explaining what he found to be alternate medical causes for the oldest child’s recurrent thigh infection, the respiratory arrest, and her anemia, Dr. Wdiitmore’s view was largely overshadowed by the overwhelming consensus of all the other medical professionals who testified. In light of the consensus of several medical professionals, many of whom testified that they had begun their investigation of the ease with the intent of determining a medical cause for the oldest child’s medical problems, we cannot say that the evidence supporting the trial court’s finding that the mother is an MBP-abuse perpetrator and its conclusion that her parental rights to her three children should be terminated is not clear and convincing.

VIII. The Father’s Arguments

The father raises two arguments on appeal. He argues first that DHR failed to establish by clear and convincing evidence that his parental rights should be terminated. Secondly, he argues that the trial court failed to recognize viable alternatives to the termination of his parental rights.

A. The Argument Concerning the Sufficiency of the Evidence

The father argues that DHR failed to present sufficient evidence that warranted the termination of his parental rights. Although there is no evidence indicating that the father abused the oldest child or that he would abuse any of the children were they returned to his care, the evidence did indicate that the father refused to believe that the mother had abused the oldest child and that he would not likely be able to protect the children from continued abuse even if he were no longer living with the mother. The testimony of the experts, Dr. Feldman and Ms. Lasher, was unequivocal—a person who does not believe that MBP abuse has occurred cannot protect a child from the perpetrator. In light of the trial court’s determination that the mother was the perpetrator of MBP abuse and the father’s admitted disbelief of this fact, the trial court had ample evidence to support its determination that the father was “unable or unwilling to discharge [his] responsibilities to and for the childfren] ... and that such conduct or condition [was] unlikely to change in the foreseeable future” because of the father’s inability to protect the children from future MBP abuse at the hands of the mother. § 26-18-7(a).

B. The Argument Concerning Viable Alternatives to Termination

Secondly, the father argues that the trial court erred by not considering viable alternatives to termination of his parental rights. Specifically, the father argues that his mother, T.F., and the mother’s “mother,” A.M., both indicated that they would be willing to take custody *335 of the children if necessary to prevent the termination of the parents’ parental rights. As discussed above, both Dr. Feldman and Ms. Lasher stated that relatives who do not believe that a parent has committed MBP abuse cannot adequately protect the children from further abuse by that parent. Dr. Feldman stated that relative placements in such situations rarely work because, despite assurances to the contrary, relatives seldom continue following court orders requiring the child victim to be kept away from the parent who perpetrated the MBP abuse once the initial shock of the child’s removal from the family wears off. He also said that in this case the mother has not admitted her abuse and none of the family members believe that the mother committed the abuse; therefore, in his opinion, placement with relatives is too risky for the children. Ms. Lasher also stated that, in her opinion, relative placement in this case was not an acceptable alternative. Based on this evidence, we cannot say that the trial court did not have a basis for finding that no viable alternatives to the termination of the father’s parental rights existed.

IX. Conclusion

Cases involving the termination of a parent’s right to his or her children are the most difficult decisions faced by our juvenile courts. Although in some cases the evidence overwhelmingly and without question supports the termination of a parent’s rights, in many cases the evidence is not entirely without dispute and may, under one view, suggest that termination is not entirely appropriate. In those cases, our role as an appellate court is clear: we must presume that the judgment terminating parental rights is correct and we may reverse only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
The evidence in the present case supports the trial court’s ultimate conclusion that termination of both the mother’s and the father’s parental rights was warranted. The medical testimony and the expert opinions of Dr. Feldman and Ms. Lasher are compelling evidence in support of the trial court’s conclusion that the mother committed MBP abuse and that her parental rights should be terminated. Although the mother presented evidence that could have led to a different conclusion, we cannot say that the trial court’s conclusion is so unsupported by the evidence as to be plainly and palpably wrong. Therefore, we affirm the judgment terminating the mother’s parental rights to all three children.
The father is correct in arguing that he has never been accused of harming his children. However, the evidence at trial indicated that his refusal to believe that the mother had perpetrated MBP abuse and his continued support of the mother would place the children in danger of imminent harm were the children to be placed in his care. In addition, the evidence indicated that the placement of the children with relatives, who also refused to believe that the mother had committed the abuse, would expose the children to eontin-úed contact with the mother and put them in danger of continued abuse. We therefore affirm the termination of the father’s parental rights to his three children as well.
2030077 — AFFIRMED.
2030078 — AFFIRMED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result, without writing.

. The mother underwent three psychological evaluations; one was performed by Dr. Karl Kirkland in August 1999 and two were performed by Dr. Warren Jackson in December 1999 and August 2002, respectively. Dr. Warren Jackson noted improvement in the mother between his first and second evaluations. Notably, he stated that she had changed her excessive somatic focus and her tendency to exaggerate. He recommended that the mother be reunited with the children. However, Dr. Feldman and Ms. Lasher testified that the mother's psychological evaluations were not useful in determining whether the mother either was or would continue to be an MBP-abuse perpetrator; they noted this to be especially true in the mother’s case, because she refused to admit the abuse. In light of the fact that the trial court relied primarily on Ms. Lasher's testimony concerning whether the mother was an MBP-abuse perpetrator and the propriety of reunification, we will not *328 discuss the psychological evaluations in detail.

. At the time D.J. had visitation with the oldest child, neither of the other two children had yet been born.

. At the time Ms. Hawkins contacted T.M. and M.F., the middle child had recently been born; however, the infant had not yet been born.

. Frith had been appointed at the inception of the case, but the mother later hired Andrew Skier. Once Skier withdrew and the mother again sought appointed counsel, the court reappointed Frith.

. Arguably, the trial court’s order making the infant a “party” to his siblings' termination cases and the trial testimony concerning whether the mother, as an MBP-abuse perpetrator, could ever parent a child, put the mother on notice that DHR and the court were considering terminating her parental rights as to all three children. Although it does appear that Ala.Code 1975, §§ 26-18-5 and 26-18-6, presuppose the filing of a petition to terminate parental rights and service of that petition as prerequisites to the consideration of the termination of the parental rights of a parent, Ala.Code 1975, § 12 — 15— 71(a)(5), provides that "in appropriate cases,” a trial court may, upon a finding of dependency, terminate the parental rights of the parent. Although no case has construed the “in appropriate cases” language contained in that subsection of the dependency statute, the present case would appear to be such an appropriate case given the fact that the mother had had both of the younger children removed from her at birth as a result of the expert testimony indicating that an MBP-abuse perpetrator would abuse the siblings of his or her original victim. However, as the mother failed to preserve the issue for our review, we need not consider the issue further.