THOMAS, Judge.
This is a termination-of-parental-rights case. In September 2005, the Etowah County Department of Human Resources (“DHR”) took A.S.F. (“the child”) into custody after receiving allegations that her older half brother had raped her older half sister and after M.P.F., the child’s mother, died suddenly from a brief illness. The child, who was two years old at the time, had been reared in a Spanish-speaking home. At the time the child was taken into DHR’s custody, the child had no legally ascertained father; A.S.T. had been living with the mother at the time and claimed to be the child’s father (A.S.T. is hereinafter referred to as “the father”). In September 2006, paternity testing established that A.S.T. was the child’s father.
The other, older children in the home, who were all unrelated to the father, alleged that the father would become abusive when he drank alcohol. The children indicated that the father would hit them with electric cords and telephone cords and that the father also had abused the mother. The father denied ever hitting the older children or the mother; however, he admitted that he had had a problem with alcohol. At the time of the termination trial, the older children declined to testify, and, in fact, they recanted their abuse allegations.
Because the father admitted some alcohol abuse, DHR endeavored to provide him substance-abuse treatment. However, according to Marlene Lovell, the DHR caseworker assigned to the father’s case from September 2005 to early 2007, the treatment provider, Mountain View, which offered intensive outpatient treatment, felt that its program would not benefit the father because of his inability to speak and comprehend English. Lovell said that she communicated Mountain View’s response to the father and that she told the father *574 that he should contact the Catholic Center to see if it might offer similar services to the Latino community. According to Lo-vell, the father said that he had no need for treatment because he had “kicked the habit” himself. According to the testimony at trial, the father passed all drug and alcohol screens, and DHR no longer considered the father’s past alcohol abuse to be a barrier to reunification.
DHR also provided the father a psychological evaluation, which was performed by Dr. David Wilson, a licensed psychologist, on July 18, 2007. Dr. Wilson testified at trial regarding his evaluation, and his report was admitted into evidence. According to Dr. Wilson, his evaluation was hampered in some respects because of the language barrier. Although the father was evaluated through the aid of an interpreter, the interpreter was of Puerto Ri-can descent and spoke a different dialect than the father, who is Guatemalan. Dr. Wilson said that he had some difficulty testing the father because some of the tests he uses are available only in English. Based on the possibility that the translations might have confused the father, Dr. Wilson was uncomfortable assessing the father’s verbal IQ score; however, Dr. Wilson did indicate that, based on what testing he had accomplished, the father’s score indicated that he was in the mildly retarded range of intellectual functioning. Dr. Wilson said that he was much more certain that the nonverbal testing had yielded a clearer view of the father’s intellectual capacity; according to Dr. Wilson, the father’s test scores on the nonverbal testing indicated that he was in the mildly mentally retarded range of intellectual functioning. Based on the father’s IQ scores, Dr. Wilson opined that the father might have difficulty parenting a child without constant assistance and intervention. In his report, however, which was admitted into evidence, Dr. Wilson noted that he could not definitively state that the father was mildly mentally retarded because “when adaptive behavior is considered, he may not be.” Dr. Wilson noted that the father’s ability and willingness to work and his having worked for years in chicken plants evidences some adaptive ability. Dr. Wilson also noted that observing the father at home and with the child would be a more helpful way to determine whether the father’s limited mental capacity negatively impacted his ability to rear the child.
During the three-and-a-half-year period the child was in foster care, DHR also provided the father with supervised visitation with the child. At first, the father visited with the child only once per month, ostensibly because the father’s paternity had not yet been established. In July 2007, visitation increased in frequency to once per week in order to assist with developing a bond between the father and the child. Workers who supervised the visits noted that the father and the child had difficulty communicating during the visits; at times the child would simply walk away from the father, and she had been resistant to learning Spanish so that she could talk with him. In July 2008 or August 2008, DHR added the use of an interpreter to the individualized service plan for the father to facilitate communication between the father and the child at visits and to assist the child in learning Spanish.
The father was offered parenting classes with Craig Sitz for a short period. Although Sitz felt like the father was understanding the material, which Sitz printed in Spanish, and was aided by the use of a friend who interpreted for him during sessions, Sitz testified that he was told to discontinue the parenting classes when the father moved across town. Sitz said that he had requested to be allowed to resume *575 the parenting classes but that DHR never authorized him to do so.
Sitz also supervised visits between the father and the child for approximately six months. Sitz said that the most notable problem he observed was the inability of the father and the child to communicate with each other. According to Sitz, he was required at times to prompt the father to interact with the child, who would be playing. Sitz also testified that the father was encouraged to “teach” the child Spanish, which Sitz said the father tried for a few visits; however, Sitz commented that the child would often walk away from the father, would not try to communicate with him, and would usually communicate with Sitz instead.
The father married in the fall of 2007, and, in June 2008, he and his wife adopted an infant from a relative who could not care for the infant. The father has been employed by the same employer for 7 years; he works a 40-hour week on the day shift and earns $9.90 per hour. He works a second job on Sundays as a cook at a restaurant. Although the father is not a citizen of this country, he has a current permit allowing him to work here. The father testified at trial that he was currently taking English-as-a-second-language classes at a local junior college; the father said that he planned to continue taking the classes. The father testified in English during part of the trial; at other times, when the questions were more detailed, the father testified with the aid of an interpreter. The father has a valid international driver’s license; he does not have an Alabama drivers’ license, but he said at trial that he planned to get one.
At trial, DHR indicated that the basis for its termination petition was the language barrier between the father and the child. Although Michelle Morgan, the caseworker assigned to the father’s case in late 2007, mentioned that allegations of abuse had been made and that alcohol abuse had been indicated as a problem earlier, she focused almost solely on the communication barrier between the father and the child as the basis for the decision to file the termination petition. When questioned about whether DHR had concerns about the father’s adoption of the infant in his care, Morgan testified that DHR did not have concerns, commenting that the infant could learn to speak Spanish. Morgan further testified that DHR had offered the father the following services: a psychological examination, visitation, language translation services during visitation, parenting classes, and a referral for substance-abuse treatment.
The juvenile court terminated the father’s parental rights, stating in its judgment that DHR had made reasonable efforts to reunite the father and the child, specifically enumerating “psychological evaluation, substance abuse referrals, parenting training, visitation, and language translation” as the services DHR had offered. The juvenile court also noted the fact that the father’s psychological evaluation indicated that he was “mentally limited.” Finally, the juvenile court found that the child cannot effectively communicate with the father during visits because she speaks only English and he speaks very little English. Based on those findings, the juvenile court determined that the father was “unable or unwilling to discharge his responsibilities to and for this child” and “that the conduct or condition of the father ... is such [as] to render him unable to properly care for the child, and such conduct or condition is unlikely to change in the foreseeable future.” The juvenile court further concluded that there existed no viable alternatives to the termination of the father’s parental rights. The *576 father appeals the judgment terminating his parental rights.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)). A juvenile court’s factual findings in a judgment terminating parental rights based on evidence presented ore tenus are presumed correct. R.B. v. State Dep’t of Human Res., 669 So.2d 187 (Ala.Civ.App.1995).
Section 26-18-7(a), Ala.Code 1975,[1] specified the grounds for terminating parental rights:
“If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
In deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child, the juvenile court may consider several factors, including:
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.”
Ala.Code 1975, § 26-18~7(a). In addition, when the child is not in the physical custody of the parent, the juvenile court shall consider, among other things:
“Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
Ala.Code 1975, § 26-18-7(b)(4).
DHR relied on the communication barrier between the father and the child as a basis for terminating the father’s parental rights. Based on that communication barrier, DHR argued, and the juvenile court concluded, that the father was “un *577 able and unwilling to discharge his responsibilities to and for the child” and “that the conduct or condition of the father ... [was] such [as] to render him unable to properly care for the child, and such conduct or condition [was] unlikely to change in the foreseeable future.” See § 26-18-7(a). However, the father and his wife were found to be “suitable” to adopt an infant by the probate court in their adoption case only one year before the termination of the father’s parental rights by the juvenile court, and DHR, through Morgan, has stated that it has no concerns about the father’s ability to rear that infant. The probate court’s judgment finding the father to be suitable to adopt and DHR’s lack of concern about the father’s ability to rear the adopted infant are in sharp conflict with the conclusion of the juvenile court that the father should forever lose the parental rights to his child because of the language barrier between them.
DHR did not present clear and convincing evidence demonstrating that the father’s conduct or condition is such that he is unwilling or unable to care for the child and that his conduct or condition is unlikely to change in the foreseeable future. DHR demonstrated only that the father and the child had difficulty communicating because of the language barrier between them. However, the father testified that he was taking classes to learn English and that he intended to continue taking those classes. The mere lack of the ability to communicate because of a language barrier is not insurmountable, and, in this case, it is insufficient to serve as a basis for the termination of the father’s parental rights.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, J., concur.
MOORE, J., concurs in the result, without writing.
BRYAN, J., dissents, without writing.

. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, amended and renumbered Ala.Code 1975, § 26-18-7, and enacted the Alabama Juvenile Justice Act (''AJJA”), codified at Ala.Code 1975, § 12-15-101 et seq. The effective date of the AJJA is January 1, 2009; the father has not asserted that the AJJA applies in this case.