THOMAS, Judge.
J.S. (“the father”) appeals the juvenile court’s judgment terminating his parental rights to C.S., H.S., and W.S. L.S. (“the mother”) appeals the juvenile court’s judgment terminating her parental rights to A.S., C.S., H.S., and W.S. R.S. (“the paternal grandmother”) also appeals the juvenile court’s judgment terminating the parents’ parental rights. We affirm the juvenile court’s judgment as to the father and the mother, and we dismiss the paternal grandmother’s appeal.

Facts and Procedural History

On June 10, 2010, the Etowah County Department of Human Resources (“DHR”) filed in the juvenile court its petition to terminate the father’s and the mother’s parental rights to the children. On July 28, 2010, the paternal grandmother filed a motion styled “motion to intervene and motion for custody of minor child”; the paternal grandmother sought custody of A.S. The paternal grandmother’s motion to intervene was granted. The matter went to trial on August 4, 2010. The juvenile court entered a judgment on August 24, 2010, terminating the father’s and the mother’s parental rights to all the children and denying the paternal grandmother’s motion for custody of A.S.
The trial court set forth the pertinent facts in its August 24, 2010, judgment:
“There are four children who are the subject of the Petition seeking Termination of Parental rights. The children are [A.S.], born April 29, 2000, [C.S.], born August 26, 2003, [H.S.], born February 3, 2006 and [W.S.] born September 5, 2008. [The mother] is the mother of all four children. [T.D.] is the alleged father of [A.S.]. [The father] is the father of [C.S.], [H.S.], and [W.S.]. Everyone entitled to Notice of said Petition and Hearing received notice.
“This family has a long history of instability, domestic violence, and drug abuse. Over the past 10 to 11 years, [DHR] has received multiple reports, conducted multiple investigations, and offered multiple services in regard to this family. In 1999, a Child Abuse/Neglect report of physical abuse was made to Marshall County Department of Human Resources listing [the mother] and her siblings as persons at risk. At the age of 14, [the mother] gave birth to her first child, [A.S.] on April 29, 2000. In 2001, a report was made to [DHR] that [the mother] was responsible for the physical abuse of [A.S.] [DHR] attempted to work with the mother without success. At [DHR’s] request, custody of [A.S.] was granted to the maternal grandmother ... in 2002.
“[The mother] was 16 years old and [the father] was 28 years old when they began dating. [The mother] and [the father] married and their first child, [C.S.], was born August 26, 2003. Within two months of [C.S.’s] birth, [DHR] received a report that the baby had been physically abused by the parents. [The parents] voluntarily gave custody of [C.S.] to the paternal aunt and uncle ... through a private attorney. [DHR] offered [the parents] services which they refused.
“Another report was made regarding [the parents] in 2004 to the Marshall County Department of Human Resources regarding an issue of domestic *1215 violence. [DHR] again offered [the parents] services which [the parents] accepted. The services were continued in Etowah County. In September of 2004, [the parents] regained custody of [C.S.] with [DHR] having protective supervision. [DHR] closed the case in early 2006.
“[DHR] received two more reports in 2007. In April of 2007 a report alleged there was another episode of domestic violence and that the children were living in an unsanitary condition. [The mother] denied the allegations, however[;] she admitted that following the April 2007 report the children were placed outside the home in a safety plan until the home was cleaned. In December of 2007, [DHR] performed a prevention assessment following a report that [the mother] was medicating [A.S.] to make her sleep. [The mother] denied the allegation.
“In November 2008, [DHR] received a report alleging [the parents] were arguing at the children’s school. [The mother] denied this allegation. [The father] testified that an incident did occur at the school but that he was arguing with another family member, not [the mother],
“The current case began on April 19, 2009 when [DHR] received a report alleging [the parents] had been arguing and that [the mother] had threatened to kill her children. The children were placed with [the mother’s] sister ... through a safety plan and the case was opened to services. Although [the mother] denies she violated the safety plan, [DHR] requested and received a pick-up order on May 4, 2009 and a 72 hour Shelter Care hearing was held on May 5, 2009. [DHR] was awarded custody of the children and the children were placed with their paternal aunt and uncle.... An Adjudicatory Hearing was held on June 10, 2009 and custody of the minor children was transferred to [DHR]. In July of 2009 a report was made that there had been sexual behavior between the [paternal aunt and uncle’s] son and [A.S. and C.S.]. The children were interviewed by the Barrie Center for Children. No charges were filed and Beth Hughes testified that in her opinion the behavior was nothing more than normal exploratory behavior. The children were removed from the [paternal aunt and uncle’s] home and placed into foster care on August 21, 2009 following a hearing on a motion filed by the mother. The mother’s motion alleged, in part, that the children were not safe in the [paternal aunt and uncle’s] home and that [DHR] had refused to provide her services to assist her in being reunified with her children.
“The children have been in [DHR’s] custody since May 4, 2009. [DHR] has had multiple Individual Service Plan [ (TSP’) ] meetings with this family and repeatedly has offered the parents services. Although each denies responsibility, both parents admit to a history of domestic violence. The parents have divorced. [The mother] obtained a felony warrant against [the father] for domestic violence and that case currently is pending in Etowah County. Both parents also admit to a long history of drug abuse. Services offered by [DHR] have included individual counseling, psychological assessment, parenting classes, anger management classes, drug screens, and supervised visitation.
“Dr. Dennis Sizelove performed a psychological evaluation on [the father] on May 6, 2009. Dr. Sizelove’s diagnoses for [the father] included polysubstance dependence, undifferentiated somato-form disorder, and adjustment disorder with mixed anxiety and depressed mood. *1216 Dr. Sizelove recommended, in part, that [the father] participate in counseling or therapy and in anger management classes. During his testimony at this hearing, [the father] agreed that he currently is not ready or able to provide a home for his children. Soon after the children were placed in [DHR’s] custody, [the father] allowed a female friend to stay at his home. While [the father] was at work on August 19, 2009, a methamphetamine lab exploded at [the father’s] house and the woman was transported by Lifesaver helicopter to UAB hospital to be treated for severe burns sustained in the explosion. [The father] did not begin to participate in the color code drug screen program until May 27, 2010 at which time he tested positive for methadone and marijuana. [The father] began but did not finish counseling with Dr. Bill Green. [The father] did complete anger management classes in April of 2010. [The father] currently is living with a girlfriend whose visitation rights with her own children were terminated when she went to prison in Florida. [The father] testified that he would like to see the minor children placed with his mother, [the paternal grandmother].
“In the current case, [the mother] agreed to participate in individual counseling, obtain her GED, and obtain stable housing and employment. [The mother] was diagnosed several years ago with bipolar disorder and has a history of noncompliance with her treatment. Dr. Dennis Sizelove performed a psychological evaluation on [the mother] on April 28, 2009. Dr. Sizelove’s diagnoses for [the mother] included post-traumatic stress disorder, bipolar disorder, cannabis and nicotine dependence, amphetamine abuse, and personality disorder, not otherwise specified with borderline, antisocial and paranoid features. Dr. Sizelove recommended, in part, that [the mother] participate in counseling or therapy. Once [the mother] learned about Dr. Sizelove’s diagnoses, she angrily confronted him in his office prompting him to make an incident report. At an ISP meeting, [the mother] agreed to begin counseling with Beth Hughes[;] however, [the mother] failed to return Ms. Hughes’ telephone calls or schedule an appointment. [The mother] was then given an opportunity to select her own counselor. At some point [the mother] initiated her own counseling at Mountain View Hospital and then [the mother] requested [that DHR] arrange counseling with Carol Costner which it did.
“In December of 2009 and again in January of 2010, [the mother] attempted to commit suicide by taking an overdose of medication. Following both suicide attempts, [the mother] was admitted to Gadsden Regional Medical Center and was evaluated and treated by a psychiatrist. Following each hospital discharge, [the mother] failed to take her medications as ordered and failed to follow the psychiatrist’s recommended outpatient treatment. Following her January 2010 release from the hospital, [the mother] was arrested on an outstanding warrant for theft of property. [The mother] admitted she stole from her aunt and that as a result entered into the Etowah County drug court program. Carol Costner discharged [the mother] in May, 2010 because of [the mother’s] lack of insight regarding her own behavior and her lack of progress.
“Almost immediately following her separation from [the father], [the mother] began a relationship with a married man. Since this case began, [the mother] has had at least 4 different residences. In December 2009, [the mother’s] boyfriend moved out of their home and on that same day [the father] moved *1217 in. Within a few days, [the father] moved back out of the home and the boyfriend moved back in. While living in Altoona, Alabama, [the mother] called the police on at least one occasion alleging she was afraid of her boyfriend. At the time of this hearing, [the mother] was still in a relationship with her boyfriend. [The mother] testified that she had received her GED and that she currently was compliant with the drug court program. However, [the mother] also testified that she did not intend to take any medicine for her bipolar disorder because she wanted to be able to feel her emotions. [The mother’s] application for social security disability has been approved and she does not plan to work.
“The history between [the mother] and her former in-laws shows significant fluctuations between cooperation to antagonistic. [The parents] voluntarily gave [the paternal aunt and uncle] custody of [C.S.] when she was an infant[;] in the instant case, [DHR] placed the children with the [the paternal aunt and uncle]. At that time the paternal grandmother also lived with the [the paternal aunt and uncle]. That placement was disrupted by [the mother]. In August 2009, the Court ordered [DHR] to remove the children from the [paternal aunt and uncle’s] home based in part on [the mother’s] insistence that the children were in danger in the home and would be safer in foster care. Less than a year later, at a July 8, 2010 ISP meeting, [the mother] told all those present that she and [the paternal aunt] were best friends. At the termination hearing, [the mother] testified that if the minor children were not returned to her custody that she wanted them to be placed with [the paternal grandmother].
“Counselor Beth Hughes testified that in her opinion the children should not be placed with relatives. [The mother’s] behavior repeatedly has created conflict and disrupted the minor children’s placements with the original safety plan, the [paternal aunt and uncle], and with their first foster mother [A.F.], [The mother] maintains contact with the children by telephone and supervised visits. [The mother] continues to disrupt the children’s stability by sharing adult information and family drama with them, by including them in decisions regarding her relationships with her boyfriend and [the father], by telling them about her moves, and by telling them they will be coming home again. Further, Beth Hughes testified that if the children were placed with [the paternal grandmother] she did not believe [the paternal grandmother] would be able to protect the children from the family drama or be able to prevent [the mother], [the father], and/or the [paternal aunt and uncle] from disrupting the children’s sense of stability. Moreover, a placement with [relatives] could be extremely damaging to the siblings’ bond, and to [A.S.] who is not related to [the father’s family]. In Beth Hughes’ professional opinion, the children need permanency immediately and that they will do much better individually and as a sibling group outside of the family unit.
“Counselor Beth Hughes has provided counseling to the three older children, [A.S.], [C.S.], and [H.S.]. [H.S.] was 3 years old when she came into foster care and has needed very little counseling. Beth Hughes testified that [A.S.] has been diagnosed with [attention deficit/hyperactivity disorder], and suffers from anxiety and depression. [C.S.] suffers from anxiety. Both [A.S.] and [C.S.] indicated that their parents argued often and it scared them. [A.S.] also indicated that she often was the *1218 caregiver for her younger siblings, changing diapers, fixing bottles and putting baby [W.S.] to sleep. Ms. Hughes testified that one of the minor children’s biggest strengths is their close sibling bond.
“The two older children are very aware of the pending petition asking for the termination of the parents’ parental rights. [A.S.] feels that [the father] is to blame for her separation from her mother and that the [the paternal aunt and uncle] allowed [C.S.] to be sexually molested by their son. Moreover, she feels that she is treated differently by the [paternal aunt and uncle] and [the paternal grandmother] because she is not a blood relation. [A.S.] repeatedly and emphatically has stated she does not want to live with the [paternal aunt and uncle] or with [the paternal grandmother].
“The [paternal aunt and uncle] and [C.S.] have had a close bond since she was an infant. [C.S.] would like to live with the [paternal aunt and uncle]. Because of their opposing wishes, [A.S.] and [C.S.] have been at odds with each other and both are experiencing a high level of anxiety caused by their conflict and the issue of their permanency. [H.S.] appears to have a close bond with her siblings and has been upset by the current conflict between her older sisters.
“Both parents were asked to provide a list of potential relative resources. [The father] provided the names of his sister and brother-in-law, [the paternal aunt and uncle], and ... [the paternal grandmother], All three relatives were living in the [paternal aunt and uncle’s] home at the time the Petition for Termination of Parental Rights was filed. The [paternal aunt and uncle’s] home is the home the Court ordered the children to be removed from in August of 2009. At the July 8, 2010 ISP meeting, [the paternal grandmother] stated she had obtained her own two bedroom and one bath house. However, her plans for the minor children while she is at work is for the [paternal aunt and uncle] to babysit. On July 28, 2010 [the paternal grandmother] filed a Motion to Intervene and Motion for Custody. [The paternal grandmother] testified that she waited to intervene because she thought the children would be returned to their parents. [The paternal grandmother] testified that if the Court granted her custody of the children she would take an early retirement from work. [The paternal grandmother’s] retirement income would be $900.00 per month and her basic expenses would be over $1,400 per month. [The paternal grandmother] testified that prior to the April 2009 incident ... she never saw any concerns about [the parents’] ability to parent the children. Moreover, [the paternal grandmother] believed if she had custody of the children and the parents seemed to be doing better in the future the children should be returned to their custody. [The paternal grandmother] is not a viable relative resource because she is not a relative of [A.S.], has a lack of protective capacity, and has limited resources.
“[The mother] named [the maternal grandmother] and her sister ... as potential relative resources. [The maternal grandmother] was not approved as a viable relative resource because she told [DHR] that she could not care for the children unless [DHR] allowed [the mother] to live with her and care for the children while she worked at night and while she slept during the day. [The mother’s sister] was the initial safety plan for the children which was disrupted when the mother was allowed to take *1219 the children out of the home unsupervised.
“The minor children have been in [DHR’s] custody since May 4, 2009. The minor children are in need of and entitled to the opportunity to have a permanent home. There are no suitable relative resources for the minor children.”
The mother filed a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P., on September 3, 2010, which the juvenile court denied. The father, the mother, and the paternal grandmother timely filed their appeals.

Standard of Review

The juvenile court entered its judgment after receiving ore tenus testimony.
“ ‘ “ ‘[Wjhen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ ” ’ Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala.2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005), quoting in turn Philpot v. State, 843 So.2d 122, 125 (Ala.2002)). ‘“The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Wattman v. Rowell, 913 So.2d at 1086.”
Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007).

Discussion

Under Alabama law,
“[a] juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). Concerning the first prong of the test, the petitioner must prove by clear and convincing evidence that grounds for termination exist. See § 12-15-319, Ala. Code 1975; and Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). Section 12-15-319 reads, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
“(1) That the parents have abandoned the child, provided that in these cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
*1220 “(2) Emotional illness, mental illness, or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child.
“(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by the treatment of a sibling.
“(4) Conviction of and imprisonment for a felony.
“(5) Commission by the parents of any of the following:
“a. Murder or manslaughter of another child of that parent.
“b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or manslaughter of another child of that parent.
“c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term serious bodily injury shall mean bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
“(6) Unexplained serious physical injury to the child under those circumstances as would indicate that the injuries resulted from the intentional conduct or willful neglect of the parent.
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
“(8) That parental rights to a sibling of the child have been involuntarily terminated.
“(9) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.
“(10) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the Department of Human Resources, or any public or licensed private child care agency, and agreed to by the parent.
“(11) Failure by the parents to maintain consistent contact or communication with the child.
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
“Clear and convincing evidence” is “ ‘[e]vi-dence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975).
Initially, the mother alleges that Talessia English, the DHR caseworker assigned to the case, testified at trial “that up until the time of the permanency hearing when the ^juvenile court] ordered that a Petition to Terminate Parental rights be filed, it was the intent of DHR to continue to try and reunite the children with their Parent or Parents,” and, thus, she argues that the juvenile court “erred in ordering *1221 [DHR] to file for termination of parental rights.” We will not, however, consider this argument on appeal because it was not properly preserved for our review. The mother did assert in her postjudgment motion that “[d]uring a permanency hearing on May 20, 2010 The Honorable District Court Judge, Wayne Owen, Ordered [DHR] to File a Petition for termination within 2 months of the permanency hearing.” However, nothing in the record demonstrates that the mother argued before the juvenile court that such action was error. Because the mother failed to raise this argument below, we will not consider it on appeal. Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992) (“This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”).
Next, the mother argues that there was no clear and convincing evidence in the record to support the juvenile court’s judgment terminating her parental rights. Specifically, the mother relies on Fitzgerald v. Fitzgerald, 490 So.2d 4 (Ala.Civ.App.1986), and argues that a juvenile court must consider a parent’s present circumstances, as well as his or her past history, in a termination proceeding. The mother then appears to argue that her present circumstances, specifically the facts that she had obtained her GED, had remained drug and alcohol free for several months, had obtained a house big enough for her and the children, and had begun receiving Social Security disability payments, were such that any evidence of her past history was irrelevant, and, thus, she argues, there was no clear and convincing evidence to support the juvenile court’s judgment terminating her parental rights to the children. We disagree.
Nothing in the record indicates that the juvenile court did not properly consider all circumstances, past and present, in terminating the mother’s parental rights. As stated in its judgment, the juvenile court considered the facts that, at the time of the trial, the mother had received her GED and was “compliant with the drug program.” However, when the record is considered in its totality, clear and convincing evidence was presented from which the juvenile court could have found that the mother was presently “unable or unwilling to discharge [her] responsibilities to and for the child[ren], or that the conduct or condition of the [mother] rendered] [her] unable to properly care for the children] and that the conduct or condition is unlikely to change in the foreseeable future-” § 12-15-319(a).
As set forth above, the juvenile court relied upon extensive and undisputed evidence in support of its judgment terminating the mother’s parental rights. In summary, the record establishes that the mother has a long history of instability, domestic violence, drug abuse, and DHR involvement. The juvenile court’s judgment also set forth evidence concerning the current case, which began on April 19, 2009, when DHR received a report alleging that the parents had been arguing and that the mother had threatened to kill the children. The record indicates that the mother has serious psychological disorders, including bipolar disorder, and that the mother refuses to submit to proper treatment of her disorders. The record also indicates that the mother has attempted to commit suicide on two separate occasions. The record indicates that the mother has not established a stable home environment for the children and is dating a married man. The record also indicates that DHR offered services, including individual counseling, psychological assessment, parenting classes, anger-management classes, drug screens, and supervised *1222 visitation. As set forth in the juvenile court’s judgment, the record is replete with clear and convincing evidence to support the juvenile court’s judgment terminating the mother’s parental rights.
Next, the mother relies on M.A.J. v. S.F., 994 So.2d 280 (Ala.Civ.App.2008), and argues that she was not allowed sufficient time to rehabilitate herself. The mother argues that the period from August 2009, when the children were placed in foster care, to August 2010, when the mother’s parental rights were terminated, was not a reasonable amount of time to rehabilitate herself given the severity of her condition. However, the mother failed to raise this argument before the juvenile court. Because the mother failed to raise this argument below, we will not consider it on appeal. Andrews, 612 So.2d at 410 (“This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.”).
Regardless, in M.A.J., this court held that
“ ‘[a]t some point, ... the child’s need for permanency and stability must overcome the parent’s good-faith but unsuccessful attempts to become a suitable parent.’ M.W. v. Houston County Dep’t of Human Res., 773 So.2d 484, 487 (Ala.Civ.App.2000). Consistent with that statement, ... we hold that when DHR timely exerts reasonable rehabilitation and reunification efforts, the parents generally shall have 12 months from the date the child enters foster care to prove that their conduct, condition, or circumstances have improved so that reunification may be promptly achieved.
“We have also held that ‘[t]he point at which the child’s needs overcome the parent’s right to be rehabilitated must be determined based on the facts of each individual case.’ Talladega County Dep’t of Human Res. v. M.E.P., 975 So.2d 870, 374 (Ala.Civ.App.2007). That statement recognizes that there may be cases in which the circumstances dictate that a lesser or greater period of rehabilitation would be reasonable. Due to the emphasis on prompt permanent disposition of children in foster care, the juvenile courts should only extend the period of rehabilitation when the evidence establishes that a limited additional amount of time or effort will necessarily result in the rehabilitation of the parent and accomplishment of the goal of family reunification or that an equally ‘compelling reason’ justifies additional time.”
994 So.2d at 291.
In the present case, the mother was given 12 months from the time the children entered foster care until the juvenile court entered its judgment terminating her parental rights. The mother has failed to show a “compelling reason” as to why the period for her rehabilitation should be extended beyond the 12-month period. The mother argues that the 12-month rehabilitation period she was given was “an unreasonable amount of time to expect lasting change given the severity of [her] condition.” The mother argues that “her need for help and/or the lack of DHR to provide her services that would help her in the rehabilitation process” is a compelling reason for granting her additional time to be rehabilitated. We disagree. Although the mother had made some strides in her rehabilitation, the evidence shows that the mother refused to participate in the counseling that DHR had arranged for her and that the mother persistently refused to take medication for her bipolar disorder. The mother also refused to follow her outpatient-treatment guidelines following her two attempted suicides. *1223 Based on the mother’s demonstrated refusal to participate in the services offered by DHR and her refusal to treat her bipolar disorder, there was certainly evidence to support the juvenile court’s conclusion that the children’s interest in permanency had overcome the mother’s interests in rehabilitation.
The father also raises the argument on appeal that, given additional time, he is capable of being rehabilitated. However, the father does not allege that any particular compelling reason would justify extending the rehabilitation period beyond the presumptively adequate 12-month period. Further, even though the father had made some strides in rehabilitating himself, he indicated at trial that he is currently unable to care for the children. Therefore, the juvenile court’s conclusion that the children’s interest in permanency had overcome the father’s interest in rehabilitation is supported by the record.
Next, the father, the mother, and the paternal grandmother argue that the juvenile court erred in determining that the paternal grandmother was not a viable alternative to termination of the parents’ parental rights. In R.L.M.S. v. Etowah County Dep’t of Human Resources, 37 So.3d 805 (Ala.Civ.App.2009), this court held that,
“[bjefore terminating parental rights, a juvenile court must determine that there are no viable alternatives. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). One viable alternative is placement of the child at issue with a suitable relative qualified to receive and care for the child while the parent completes the rehabilitative process, when such placement serves the best interests of the child. See Ex parte J.R., 896 So.2d 416 (Ala.2004). A relative is suitable and qualified to receive and care for a child when the relative ‘can safely and properly discharge the parental responsibilities of meeting the child’s needs during the child’s minority.’ J.B. v. Cleburne County Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008). Whether a relative is suitable to assume custody of a child and whether such placement serves the best interests of the child are both questions of fact to be determined by the juvenile court. See T.B. v. Cullman County Dep’t of Human Res., 6 So.3d 1195, 1204-05 (Ala.Civ.App.2008).”
37 So.3d at 812.
Concerning the paternal grandmother’s appeal, the paternal grandmother’s only argument on appeal is that there was no credible evidence to support the juvenile court’s judgment that she was not a viable alternative to termination of the parents’ parental rights. The paternal grandmother does not argue that the juvenile court erred in denying her petition for custody. In D.M. v. Walker County Department of Human Resources, 919 So.2d 1197 (Ala.Civ.App.2005), this court addressed an appeal in which a child’s aunt challenged a juvenile court’s decision to terminate the parental rights of the child’s parents; this court stated:
“In her brief on appeal, the aunt has not argued that the juvenile court erred in denying the April 14, 2004, joint petition for custody to which she was a party. Rather, the aunt argues issues that pertain only to the propriety of that part of the juvenile court’s September 29, 2004, judgment in which the court ordered that the parents’ parental rights be terminated. However, the aunt has no legally protected parental right with regard to the children at issue. See State v. Property at 2018 Rainbow Drive, [740 So.2d 1025 (Ala.1999) ]. Further, the aunt may not assert arguments on behalf of the parents.
*1224 “ ‘ “ ‘[A] litigant may not claim standing to assert the rights of a third party.’ ” Ex parte Izundu, 568 So.2d 771, 772 (Ala.1990) (quoting Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 417 A.2d 1003 (1980)). “A party lacks standing to invoke the power of the court in his behalf in the absence of a ‘concrete stake in the outcome of the court’s decision.’ ” 568 So.2d at 772 (quoting Brown Mech. Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 937 (Ala.1983)).’
“Lott v. Eastern Shore Christian Ctr., 908 So.2d 922, 932 (Ala.2005). We conclude that the aunt lacks standing to prosecute the issues raised in her brief on appeal; therefore, we must dismiss her appeal. Goodyear Tire & Rubber Co. v. Moore, 900 So.2d 1239 (Ala.Civ.App.2004).”
919 So.2d at 1205-06 (footnote omitted).
Similarly, in the present case, the paternal grandmother has no legally protected parental rights in the children, and she cannot assert arguments on behalf of the children’s parents. We conclude that the paternal grandmother lacks standing to prosecute the issues raised in her brief; accordingly, we dismiss her appeal.
The father and the mother both argue on appeal that the juvenile court’s judgment holding that the paternal grandmother was not a viable alternative to the termination of their paternal rights was not supported by clear and convincing evidence. We disagree. In its determination that the paternal grandmother was not a viable alternative, the juvenile court relied on extensive evidence in the record. Specifically, as set forth in greater detail above, the juvenile court determined that the paternal grandmother “is not a viable relative resource because she is not a relative of [A.S.], has a lack of protective capacity, and has limited resources.” Therefore, we hold that the juvenile court’s judgment was supported by clear and convincing evidence.

Conclusion

Based on the foregoing, we affirm the juvenile court’s judgment as to the father and the mother. Further, we dismiss the appeal of the paternal grandmother.
2091152 — AFFIRMED IN PART; APPEAL DISMISSED IN PART.
2091183 — AFFIRMED.
THOMPSON, P.J., and PITTMAN,
BRYAN, and MOORE, JJ., concur.