MOORE, Judge.
 

 In appeal number 2080892, R.L.M.S. (“the mother”) appeals from the Etowah Juvenile Court’s judgment terminating her parental rights to A.C. and J.C., two of her children (“the children”). In appeal number 2080926, J.B.C. (“the father”) appeals from that same judgment to the extent that it terminated his parental rights to the children. We affirm.
 

 Procedural History
 

 On May 1, 2009, the Etowah County Department of Human Resources (“DHR”) filed petitions to terminate the parental rights of the mother and the father. After a June 19, 2009, trial, the juvenile court entered a judgment terminating the mother’s and the father’s parental rights to the children on June 29, 2009. The mother and the father both timely appealed from that judgment; this court consolidated the appeals
 
 ex mero motu.
 

 Issues
 

 In her appeal, the mother argues that the juvenile court erred in terminating her parental rights because, she contends, the juvenile court failed to consider her current conditions. The mother also argues that the juvenile court erred in finding that placing the children with the children’s maternal grandmother, K.P., was not a viable alternative to terminating the mother’s parental rights. In his appeal, the father “adopts and incorporates the arguments of [the mother].”
 

 Mother’s Current Conditions
 

 Section 12-15-319(a), Ala.Code 1975,
 
 [1]
 
 a part of the Alabama Juvenile Justice Act, codified at § 12-15-101 et seq., Ala.Code 1975, provides, in pertinent part:
 

 “If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to
 
 *808
 
 and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents.”
 

 As previously construed by this court, the above-quoted language evinces the legislative intent that parental rights may be terminated only upon clear and convincing proof that, at the time of trial, the parent presently demonstrates an inability or unwillingness to discharge his or her responsibilities to and for the children at issue or that the conduct or condition of the parent renders the parent presently unable to properly care for the children at issue and that such conduct or condition is unlikely to change in the foreseeable future.
 
 See D.O. v. Calhoun County Dep’t of Human Res.,
 
 859 So.2d 439, 444 (Ala.Civ.App.2003) (“[T]he existence of evidence of
 
 current
 
 conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.”).
 

 Focusing on her circumstances leading up to, and at the time of, the trial, the mother maintains that DHR did not present clear and convincing evidence of a present inability on her part to properly care for the children. The evidence shows, without dispute, that, on January 1, 2009, the mother was released from jail following an eight-month incarceration period. Within a week, the mother met one of DHR’s stated goals for her by extricating herself from a lengthy harmful relationship with the father that had been characterized by recurring domestic violence and criminal conduct. Shortly thereafter, the mother complied with another of DHR’s conditions by establishing a stable and suitable residence in a mobile home with B.S., a steadily employed nonviolent man with no criminal background, with whom she began a romantic relationship. The mother then met another of DHR’s goals by obtaining steady and suitable employment at a local restaurant, earning $280 to $300 per week. Over the next five months until the time of the trial, the mother consistently visited with the children while maintaining her relationship, residence, and employment with no incidences of criminal behavior or domestic violence. The mother also apparently resolved her legal troubles by arranging to serve 115 months of probation, paying restitution, and performing community services, rather than returning to jail. Talessia English, the DHR caseworker assigned to the ease in 2007, testified that the mother appeared “relatively stable.” Mildred Heard, a DHR caseworker who had previously been assigned to the case, testified that the mother appeared to be in a situation very similar to the one existing in 2006 when Heard had been “very comfortable” placing the children with her.
 

 However, when deciding whether grounds to terminate parental rights exist, the juvenile court is not limited to evidence of current conditions; it may also consider the past history of the parent.
 
 Ex parte State Dep’t of Human Res.,
 
 624 So.2d 589, 593 (Ala.1993).
 

 The mother’s past history shows that the mother first lost custody of A.C. in January 2006 when law-enforcement officials discovered A.C. and another of the mother’s daughters, C.W., abandoned in an automobile on the side of a public highway without sufficient clothing or food. Although the mother was working at the time and was not directly at fault for the incident, DHR determined that the mother could not regain custody of A.C. and C.W. without first participating in an individualized service plan (“ISP”) meeting. Ac
 
 *809
 
 cording to Heard, over an eight-month period, the mother completed a psychological evaluation, parenting classes, and domestic-violence-prevention classes. In addition, she met established goals of obtaining employment and suitable housing. However, the mother did not comply with Heard’s request that she end her relationship with the father.
 
 [2]
 
 The mother told Heard that she and the father were no longer together, but, in actuality, she continued her relationship with the father, conceiving J.C. with the father in March 2006 and hiding that pregnancy from DHR.
 
 [3]
 
 Unaware of the mother’s continued involvement with the father, Heard and DHR agreed to place A.C. and C.W. back with the mother on September 20, 2006, on a “trial basis.”
 

 The mother gave birth to J.C. on December 20, 2006. Heard testified that at that time DHR did not perceive J.C. to be “at risk” and that she was “very comfortable” with allowing the mother to keep custody of J.C. After a brief hospital stay, the mother took the infant J.C. into the home with the father and the mother’s other children.
 
 [4]
 
 At some point thereafter, Heard discovered that the father was living with the mother, and Heard informed the father that he would have to meet his own ISP goals. She scheduled a psychological evaluation for the father more than once, but he never underwent an evaluation. The father did not attempt to complete any part of the ISP goals established by Heard. Nevertheless, DHR did not take any steps to remove the children from the home; apparently, DHR was satisfied with the level of care the mother provided to the children.
 

 The children and C.W. were removed from the custody of the mother in April 2007 when she was arrested and incarcerated for felony identify theft and for forging checks; the father also was confined to jail at that time, apparently for related charges. W.S., the mother’s legal husband, obtained custody of C.W., but DHR could not find a suitable relative to receive and care for the children, so they were placed into foster care. At that point, Talessia English, a DHR social-services worker, took over the case. English testified that she met with the mother while the mother was in jail in July 2007 and that the mother told her that she had committed the crimes to fund her addiction to the prescription painkiller Lorcet. However, English later testified that the mother had “changed her story” about her alleged drug addiction.
 
 [5]
 

 When released from jail in November 2007, the mother immediately contacted English to determine how she could regain custody of the children. English testified that the mother was very cooperative with DHR at that time. The mother informed English that she intended to reunite with W.S., who continued to have custody of C.W. English performed a home study of W.S.’s residence, and DHR placed the children with the mother in W.S.’s home on December 19, 2007, on another “trial basis.”
 

 
 *810
 
 Two weeks later, after the father was released from jail and he and the mother reunited, the mother informed English that she intended to leave W.S. English agreed to let the children remain with W.S. until the mother could obtain suitable shelter and employment. The mother subsequently moved in with the father in a suitable home. English developed another ISP with the family. Pursuant to that ISP, in January 2008, the mother and the father took physical custody of the children with DHR providing day-care services. The father agreed to participate in parenting classes; however, he was arrested and again incarcerated in February 2008, without having met his ISP goals. According to English, except for one episode,
 
 [6]
 
 the mother provided proper care for the children between January and April 2008, and DHR actually recommended returning the children to the mother permanently in February 2008 if she obtained a valid driver’s license, which she did not do.
 
 [7]
 

 The children entered foster care for the last time in April 2008. The mother had arranged with the children’s former foster mother to care for the children temporarily. While in the foster mother’s home, the mother stole a checkbook and later forged at least two checks. She was subsequently arrested and again incarcerated, this time from April 2008 until January 1, 2009. English testified that the father got out of jail around the time of the mother’s offense and that she initiated the reunification process with him, but he did not meet any of his ISP goals, forcing the children to remain in foster care.
 

 Upon her release from jail on January 1, 2009, the mother again sought out the father, who was then on parole living “off and on” with B.S., the father’s longtime friend and former coworker. The mother testified that one condition of the father’s parole required the father not to communicate with the mother. The mother testified that due in part to that condition and a “falling out” between them, the mother and the father parted in early January 2009. The father subsequently returned to jail, and the mother’s only communication with him since January 2009 was a letter she had received shortly before trial. After the parents split, the mother almost immediately started “dating” and living with B.S., who she had known for four years, sharing living expenses.
 
 [8]
 

 Heard testified that although the mother appeared to be in the same situation as the one that existed in 2006 when she was “very comfortable” returning the children to the mother, that placement had not worked out due to the mother’s subsequent criminal conduct and incarcerations. English testified that she was concerned about the mother’s recurrent criminal conduct. English also testified that mother had exhibited a “pattern of behavior” of relying on other men to help stabilize her circumstances until she could regain eusto-
 
 *811
 
 dy of the children, only to then return to the father and lose custody of the children because of her legal problems. As English put it, the mother would “hold it together” for a few months, but then “something happens” to cause instability in her and the children’s lives. English testified that, although the mother appeared “relatively stable” at the time of trial, she could not recommend returning the children to the mother. English testified that she did not know whether the mother would remain out of jail, whether the mother would remain consistently employed, or whether the mother would stay with B.S. English said that the children need permanency and that they should not have to 'wait and see how the mother would do.
 

 The mother testified that she had benefited from the parenting and domestic-violence-prevention classes DHR had provided and that she believed she could be a good parent to the children. The mother said she had done everything DHR had asked, “except for staying out of jail.” She considered her relationship with the children to be good. The mother maintained that she had no plans to reunite with the father and that she was committed to her relationship with B.S. The mother denied she had a pattern of relying on other men to regain custody of the children, stating that she had only once left the father to attempt reunification with W.S. The mother stated that since she had last been released from prison she had changed and had “got [her] life together” by, among other things, going to church and being with a man who does not hold her down. The mother testified that she deserved more time to “work this out.” The mother admitted that she had had a problem being truthful in the past, but she asked the juvenile court to believe that she had rehabilitated. B.S. testified that the mother was now “focused” and was committed to turning her life around and regaining custody of the children.
 

 As this court has noted, the question whether a parent has truly and completely rehabilitated so as to resume the custody of a child is a question of fact to be determined by the juvenile court.
 
 T.B. v. Cullman County Dep’t of Human Res.,
 
 6 So.3d 1195, 1199 (Ala.Civ.App.2008).
 

 “If the juvenile court is convinced from its observations that the parent acted shortly before the termination-of-parental-rights hearing so as to make it appear that he or she was addressing or had resolved identified obstacles to reunification but that, in reality, the barriers to reunification had only been temporarily removed or merely hidden, the juvenile court may conclude that grounds for termination still exist.”
 

 J.W.M. v. Cleburne County Dep’t of Human Res.,
 
 980 So.2d 432, 438-39 (Ala.Civ.App.2007)(plurality opinion).
 

 From the evidence regarding the mother’s past history, most of which was undisputed, the juvenile court reasonably could have inferred that the mother had engaged in a longstanding pattern of achieving temporary stability only to engage in criminal misconduct that resulted in her incarceration and inability to properly care for the children. The juvenile court also reasonably could have determined that the circumstances existing at the time of trial represented only another brief correction of the underlying condition that had led the mother to commit acts jeopardizing the health, safety, and welfare of the children. Based on that inference, the juvenile court reasonably could have concluded, as it did, that the mother remained unable to properly care for the children despite her apparent rehabilitation at the time of trial. Based on our limited standard of review, this court may not reweigh the evidence
 
 *812
 
 and substitute its opinion for that of the juvenile court; instead, this court must affirm the judgment when it is supported by clear and convincing evidence that is sufficient to sustain the juvenile court’s findings.
 
 See J.C. v. State Dep’t of Human Res.,
 
 986 So.2d 1172, 1183-86 (Ala.Civ.App.2007) (discussing application of ore tenus standard of review in termination-of-parental-rights cases). Accordingly, we do not agree that the judgment terminating the mother’s parental rights should be reversed due to the alleged failure of the juvenile court to consider the current conditions of the mother.
 

 Viable Alternatives
 

 Before terminating parental rights, a juvenile court must determine that there are no viable alternatives.
 
 Ex parte Beasley,
 
 564 So.2d 950, 952 (Ala.1990). One viable alternative is placement of the child at issue with a suitable relative qualified to receive and care for the child while the parent completes the rehabilitative process, when such placement serves the best interests of the child.
 
 See Ex parte J.R.,
 
 896 So.2d 416 (Ala.2004). A relative is suitable and qualified to receive and care for a child when the relative “can safely and properly discharge the parental responsibilities of meeting the child’s needs during the child’s minority.”
 
 J.B. v. Cleburne County Dep’t of Human Res.,
 
 991 So.2d 273, 283 (Ala.Civ.App.2008). Whether a relative is suitable to assume custody of a child and whether such placement serves the best interests of the child are both questions of fact to be determined by the juvenile court.
 
 See T.B. v. Cullman County Dep’t of Human Res.,
 
 6 So.3d 1195, 1204-05 (Ala.Civ.App.2008).
 

 In this case, the juvenile court found that K.P. (“the maternal grandmother”) was not a suitable person to assume custody of the children. Clear and convincing evidence supports that determination. The record indicates that the maternal grandmother last visited with the children at Christmastime in 2007 and that she had no ongoing relationship with the children. Although she was aware of the children’s repeated placements into the foster-care system, the maternal grandmother had made no attempts to obtain custody of the children until shortly before trial when she first offered herself as a relative placement. DHR investigated the maternal grandmother and discovered that she had been cited by DHR for neglecting the mother. The maternal grandmother also “gave” the mother to DHR at age 13 when the mother repeatedly ran away from home and the maternal grandmother determined she could not control the mother. The maternal grandmother had another child, a son, who, at the time of trial, was incarcerated at a state prison in Atmore for robbery. Additionally, the maternal grandmother testified that she is disabled due to rheumatoid arthritis. Taken together, the evidence almost compels a finding that the maternal grandmother was not fit to assume custody of the children and that placing the children with her would not be in the children’s best interests. Hence, we do not agree that the juvenile court committed reversible error in failing to place the children with the maternal grandmother.
 

 Conclusion
 

 The juvenile court properly considered current conditions in light of their historical context and properly determined that placement with the maternal grandmother was not a viable alternative; therefore, we affirm the judgment terminating the mother’s parental rights. Because the father has not raised any arguments other than those we have already rejected, we also
 
 *813
 
 affirm the judgment terminating his parental rights.
 

 2080892 — AFFIRMED.
 

 208092& — AFFIRMED.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
 

 [1]
 

 . This Code section was formerly codified at § 26-18-7(a), Ala.Code 1975. By Act No. 2008-277, Ala. Acts 2008, the Alabama Legislature, among other things, renumbered § 26-18-7(a).
 

 [2]
 

 . The mother was actually legally married to another man, W.S., but she had left W.S. without divorcing him to pursue an "on and off" relationship with the father.
 

 [3]
 

 . The mother stated that she hid the pregnancy out of fear that DHR would seek custody of the baby.
 

 [4]
 

 . The mother testified that, at that time, she lived with the father, C.W., and A.C. The mother also had another child, V.C., who did not reside with her at that time.
 

 [5]
 

 . English stated that DHR never offered the mother services aimed at resolving any alleged drug addiction because the mother had recanted her statement and the mother did not appear to have a drug problem.
 

 [6]
 

 . The mother left the children with a paternal aunt while she traveled to Gadsden. While in Gadsden, the mother's automobile broke down, extending her stay for several days. The mother did not leave sufficient diapers and food for the children, but the paternal grandmother provided them.
 

 [7]
 

 . Apparently, the mother could not afford to pay the fees associated with reinstatement of her driver’s license, which had been suspended for some unstated reason.
 

 [8]
 

 . Both B.S. and the mother testified that by the time of the trial they had become engaged. The mother testified that she had filed for divorce from W.S. in the spring of 2009, but the divorce was not yet final at the time of trial. The mother and B.S. had not set a date for their marriage, but both agreed they were waiting for the divorce to become final before proceeding.