PER CURIAM.
On December 2, 2011, the Cullman County Department of Human Resources (“DHR”) filed a petition seeking to terminate the parental rights of T.M.S. (“the father”) and B.K.H. (“the mother”) to their minor child, A.L.S. (“the child”). The Cullman Juvenile Court (“the juvenile court”) conducted an ore tenus hearing over the course of two days, during which it admitted into evidence numerous documentary exhibits. On March 6, 2013, the juvenile court entered a judgment terminating the parents’ parental rights. The mother filed a postjudgment motion, which the juvenile court denied. Thé mother timely appealed.
We note that the father did not attend the termination-of-parental rights hearing and has not appealed the March 6, 2013, judgment. This opinion refers to the facts pertaining to the father only as they impact the discussion of the issues raised by the mother.
*656 The record indicates that the child was born on January 27, 2009. Connie Yar-brough, a DHR supervisor, testified that on March 18, 2009, DHR received an order from the Cullman Circuit Court (“the circuit court”) requiring it to check on the child’s safety. Yarbrough explained that the father had petitioned the circuit court for an award of custody of the child, and, in doing so, he had alleged that the mother was using methamphetamine. Yarbrough testified that a DHR social worker, Cortni Miller, located the child in the custody of the father and that, the next day, Miller attended a hearing involving the parents and the child in the circuit court. Yar-brough testified that, at that hearing, the circuit court ordered each parent to submit to a drug screen. The mother tested negative for the use of illegal substances, and the father tested positive for the use of marijuana and benzodiazepine. Yar-brough testified that, after conducting an investigation to ensure the safety of the child, DHR decided to close the case at that time.
DHR again became involved with the family in August 2009 as the result of an incident in which the mother was home alone with the child and was drinking “Wild Turkey.” Carrie Martin, a DHR investigator, testified that at 1:54 p.m. on August 29, 2009, she received a telephone call to meet the family at the local emergency room. The mother admitted to Martin that she had been drinking heavily. Martin stated that the mother first told Martin that she thought someone had broken into her home and had cut her leg with a knife. However, according to Martin, the mother later admitted that she had cut herself but had not intended for the cut to be so deep. The mother’s brother, B.H., came to the hospital, and the child was placed with B.H. and his wife pursuant to a safety plan.
Miller, the social worker who had briefly been involved with the family in March 2009, was reassigned to the case in February 2010. At that time, the mother and the child were living with the mother’s mother and stepfather pursuant to a safety plan. Miller testified that, at a February 2010 meeting to formulate an Individualized Service Plan (“ISP”), the mother admitted that she would be unable to pass a drug screen because she had used marijuana with her mother two weeks earlier.
Miller also testified that, during the February 2010 ISP meeting, the mother disclosed to Miller that the mother’s stepfather had sexually abused her when she was approximately 11 years old and that, as a result, she had been placed in foster care in Georgia. Miller testified that, after that accusation, of which she did not believe the previous social worker had been aware, the mother’s mother and stepfather were no longer considered appropriate relative resources for the child and a safety plan that included the mother and the child living with them was also no longer appropriate. Therefore, the mother and the child went to live with B.H.
Miller stated that in April 2010 she learned that the mother was no longer living in the home with B.H. and the child and that B.H. informed her that the mother was living with her father. Miller testified that, when she went to the home of the mother’s father, she discovered that the father, who had been recently released from incarceration, was also living in that home. Miller described the house as cluttered and messy. Miller stated that, when asked, the mother informed her that neither the mother nor the father could pass a drug screen, and, in fact, both parents failed a drug screen. Also at that time, B.H. was in the process of divorcing his wife and was unable to continue to provide a home for the child. When the mother *657 informed Miller that she could not identify any other possible relative resources, the child was placed in foster care on April 22, 2010.
On April 23, 2010, the day after the child was placed in foster care, the father committed domestic violence against the mother. Miller testified that the parents were intoxicated during that confrontation. Miller also stated that the mother had informed her that the reason for the April 23, 2010, dispute that led to domestic violence was the father’s frustration with the mother for what he perceived was her conduct resulting in the authorities again asking him to submit to drug testing; the results of that testing had been reported to the police for the purpose of determining whether the father had violated the terms of his probation.
Miller stated that in May 2010 the mother informed her that when the mother and the father were together they usually did drugs, drank alcohol, and fought. Miller testified that, during that conversation, she attempted to emphasize to the mother the importance of changing her circumstances and attempting to meet the needs of the child. Miller testified, however, that, at a June 2010 hearing on the mother’s protection-from-abuse petition against the father, her observation of the mother’s conduct and demeanor led her to believe that the mother was under the influence of drugs or alcohol at that hearing. The mother remained in a relationship with the father for more than a year following the domestic-violence incident.
Miller testified that DHR offered the mother a number of services in order to assist her in stabilizing her life. The mother was offered services through a program referred to as “Family Values,” as well as training in parenting skills and budgeting. Miller testified that DHR offered the mother counseling for issues other than substance abuse and that, during the initial session, the mother was not forthcoming with the counselor. Miller stated that that counseling was not continued because the mother was not yet ready to deal with issues from her childhood.
DHR also requested that the mother submit to a substance-abuse assessment, drug screens, and substance-abuse counseling. The mother was intermittent in her compliance with the drug screens until late summer 2011. In addition to the issues addressed by the services DHR offered, DHR identified reunification goals for the mother that included obtaining employment and earning a GED.
Miller testified that the mother had a pattern of working for two to three months toward the identified reunification goals, that the mother would make progress during those periods, but that the mother would then stop cooperating or disappear. Miller explained that the mother would stop appearing for appointments and that she would be unable to locate the mother. Miller believed that some of the periods in which the mother “disappeared” were related to times in which the father was not incarcerated.
In April 2011, the mother stopped visiting the child. In August 2011, the mother was arrested on drug charges and served 90 days in jail. Miller testified that when Miller left her employment with DHR in September 2011 the child had been in foster care for 19 months and that, during that time, the mother had not made any significant progress toward stability and had recently been incarcerated on new charges.
Christy Webb, a DHR social worker, was assigned to the case from September 2011 until June 2012. When Webb was assigned in September 2011, the mother, was still incarcerated as a result of her *658 August 2011 arrest. Webb testified that following the mother’s August 2011 incarceration DHR decided to seek to terminate the mother’s parental rights, and DHR filed its petition in December 2011. Webb testified that the mother contacted her when the mother was released from jail in December 2011; at that time, the mother had been served with the termination petition. Webb stated that in January 2012 the mother obtained employment, and at a February 2012 ISP meeting DHR arranged for supervised visitation to resume.
Webb testified that in the spring of 2012, with the exception of a positive test for the use of alcohol in March 2012, the mother made good progress toward the reunification goals and maintaining stability. The mother attended substance-abuse classes, was doing drug screens through drug court, and was visiting the child regularly. In May 2012, DHR moved the juvenile court to postpone the hearing it had scheduled on DHR’s termination petition in order to allow the mother more time to demonstrate that she could properly parent the child, and the juvenile court granted that request. In June 2012, DHR expanded the mother’s visitation to unsupervised visits on Saturdays. At approximately that same time, the mother completed substance-abuse classes.
In her testimony, the mother agreed with Miller’s characterization of her compliance with DHR’s reunification goals between 2009 and July 2011. The mother admitted that, until July 2011, she lacked stability and that she would cooperate with DHR for only a few months at a time. The mother testified, however, that she made significant changes in her life in July 2011, when she met G.D. and began a romantic relationship with him. In September 2011, the mother married G.D. (hereinafter referred to as “the husband”).
The mother testified that the husband had stayed in the relationship after the mother’s August 2011 arrest and had encouraged her to do better. The mother stated that the husband had shown her how to live a stable lifestyle and meet her obligations and responsibilities. Indeed, as already indicated, Webb’s testimony indicates that, after her release from jail in December 2011, the mother made good and continual progress toward reunification.
In June 2012, Webb was transferred to another part of DHR, and Melissa Welch was assigned to handle the case on behalf of DHR. Welch testified that the progress and stability the mother had demonstrated in the first half of 2012 continued after Welch was assigned to the case. The mother’s visitation was increased in the summer of 2012, and in October 2012 the mother began exercising weekend visitation with the child. Welch testified that, at that time, the mother was cooperative with DHR’s services, was working at a fast-food restaurant, and was participating in drug court.
The husband was also involved in drug court. The husband stated that he had been charged with possession of a controlled substance after he was found with his son’s prescription medication. The record indicates that the husband was complying with the requirements of drug court. Welch testified that the husband was very good with the child and that the child calls the husband “Dad.”
Welch explained that, as a result of the progress the mother had shown in 2012, DHR decided to attempt a “trial visit” of placing the child in the mother’s home to determine whether custody could be returned to the mother. Welch testified that, during the meetings leading up to the placement of the child with the mother, DHR workers emphasized to the mother *659 the necessity that she remain sober when the child was placed in her home.
On November 27, 2012, DHR placed the child in the home with the mother and the husband. Welch visited the home after a few days and stated that everything seemed to be going well. Welch noted that the child had a “really strong bond” with the mother and was possibly even more bonded to the husband.
On December 8, 2012, the mother was arrested for driving under the influence (“DUI”). The mother and the husband testified that the mother had taken a few sips from another person’s drink at a family gathering, that the husband had been angry with her for doing so, and that, when they returned home after the gathering, the two had fought about the mother’s taking those drinks. After that fight, the mother left the house at approximately 9:00 p.m., and she drank alcohol with some friends. As the mother was driving home from her friends’ home at approximately 10:10 p.m., she lost control of her vehicle and wrecked. At the time of her arrest, the mother’s blood-alcohol level was .23. Following the December 8, 2012, DUI incident, the child was returned to foster care and DHR decided to proceed with seeking to terminate the parents’ parental rights.
The mother testified that she regretted the DUI incident and that she was disappointed in herself. The husband testified that he had seen the mother drink on only two occasions during their relationship, and the family gathering was one of those occasions. Both the husband and the mother testified that they did not believe the mother would behave in that manner again.
The mother testified that she had applied to several long-term rehabilitation facilities and that she had been accepted to one that did not allow her to bring the child. The mother stated that, at the time of the termination hearing, she was on the waiting list for two halfway houses that would allow her to live there with the child. She requested that the child be returned to her to live with her in one of the halfway houses. In response to questioning, the mother testified that she did not believe that she had a problem with alcohol, but, rather, that she had engaged in stupid behavior.
M.F.R., the child’s foster mother, testified that she could tell a difference in the mother in 2012 in that the mother clearly intended to do better in her life. The foster mother testified that the child informs her that he loves the mother and that the child still speaks to the mother on the telephone.[1] When asked how she believed a termination of the mother’s parental rights would affect the child, the foster mother stated: “I can see some behavior difference already. But I think it’s going to tear him down, I’ll be truthful. I really do.”
DHR presented evidence indicating that there were relatives willing or able to provide a placement for the child. No useful purpose would be served by detailing most of the evidence on that issue. However, at the termination hearing, the evidence on this issue tended to focus on B.H., the mother’s brother. During the pendency of this action, the mother’s brother, B.H., expressed an interest in serving as a resource for the child. However, B.H. was going through a divorce and could not take the child in 2010, so the child was placed in foster care. In December 2012, B.H. had *660 remarried. Welch testified that she asked at that time if B.H. could serve as a placement for the child and that B.H. had told her that he would discuss it with his new wife. Welch stated that B.H. did not call her back and that he did not return two additional calls she made to him after the child had been returned to foster care. B.H. did not appear at the termination hearing, and the mother did not testify that B.H. was willing and able to serve as a placement for the child.
Welch testified that the child had been in the same foster home during the time that he was in foster care. However, the foster mother was not going to adopt the child, and DHR planned to gradually introduce the child to a potential adoptive family. Welch also testified that, at the time of the termination hearing, the husband was still visiting the child on some weekends.
At the conclusion of the termination hearing, the juvenile court stated that the decision to terminate was difficult because it was clear that, during certain periods, the mother had done well. However, the juvenile court noted that the child had been in foster care for three years and that, given the history of the case, there was no guarantee that an incident similar to the December 8, 2012, DUI incident would not occur again. The juvenile court concluded that it was not in the child’s best interests to spend further time in foster care. See S.B.L. v. Cleburne Cnty. Dep’t of Human Res., 881 So.2d 1029, 1032 (Ala. Civ.App.2003) (“The paramount concern of a court in termination-of-parental-rights proceedings is the best interests of the child.”). In its March 6, 2013, termination judgment, the juvenile court found that the child was dependent and that both the mother and the father had failed to adjust their circumstances to meet the needs of the child.
The grounds for terminating parental rights are set forth in § 12-15-319, Ala.Code 1975. Our juvenile courts use a two-pronged test to determine whether to terminate parental rights:
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights.”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ. App.2004) (citing Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990)). Clear and convincing evidence is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ.App.2002) (quoting § 6-ll-20(b)(4), Ala.Code 1975).
On appeal, the mother argues that the evidence did not support the termination of her parental rights. In her own testimony, the mother admitted that she exhibited instability and did not maintain any consistent effort to reunite with the child until the summer of 2011, when the child had been in foster care for over a year. However, the mother made significant changes in her life after her August 2011 arrest, which coincided with her meeting and marrying the husband. Upon her release from incarceration following the August 2011 arrest, the mother began, in early 2012, to adjust her circumstances to meet the child’s needs. At that time, however, DHR had already filed the petition seeking to terminate her parental rights. Given the progress being made by the mother in the spring of 2012, DHR agreed *661 to postpone the hearing on that petition in order to afford the mother additional time to achieve reunification. The mother continued her reunification efforts and completed substance-abuse classes and attended counseling.
Over the course of 2012, in recognition of the progress the mother was making, DHR increased the mother’s visitation substantially and eventually attempted to return custody of the child to the mother. The child was returned to DHR’s custody following the mother’s DUI arrest in December 2012.
DHR argues, in support of affirming the termination judgment, that the child had been out of the mother’s custody for an extended period and that the child needed permanency. We are not unsympathetic to that argument, and we share the concerns expressed by DHR and the juvenile court about the child’s need for permanency.
However, in this case, the mother made significant progress, albeit late in the action, toward reunification. In response to the mother’s efforts, DHR postponed prosecuting its termination action to afford the mother additional time to achieve her reunification goals. The mother made such significant progress that DHR placed the child in her home.
Also, the evidence in this case indicates that the mother and the child have a strong emotional bond and that the child shares a similar bond with the mother’s husband. The evidence indicates that the child would be devastated by the termination of the mother’s parental rights. The foster mother testified that it would “tear him down.” The husband and the mother each testified that the incident leading to the DUI arrest was out of character for the mother, and the mother testified she was attempting to seek professional assistance to address her conduct that resulted in that incident.
The paramount consideration in any action involving the termination of parental rights is the best interests of the child. A.J.H.T. v. K.O.H., 983 So.2d 394, 399 (Ala.Civ.App.2007).
“Although a child’s parents have a prima facie right to custody, the paramount concern in these proceedings is the child’s best interests. Mitchell v. State Dep’t of Human Resources, 513 So.2d 647 (Ala.Civ.App.1987). In determining the child’s best interests, the court must examine-whether the parents are physically, financially, and mentally able to provide for the child. Mitchell. If clear and convincing evidence reveals that the parents cannot, or are unwilling to, discharge these responsibilities, parental rights may be terminated. Mitchell; § 26-18-7 [now § 12-15-319, Ala.] Code 1975.”
J.V. v. State Dep’t of Human Res., 656 So.2d 1234,1235 (Ala.Civ.App.1995).
This court has carefully considered the evidence in the record, especially the evidence concerning the child’s bond with the mother and the possible effect on him of a termination of the mother’s parental rights. Our supreme court has recently explained:
“ ‘ “[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this] case[] ‘does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.’ ” ’
“D.O. v. Calhoun County Dep’t of Human Res., 859 So.2d 439, 445 (Ala.Civ. App.2003) (quoting V.M. v. State Dep’t *662 of Human Res., 710 So.2d 915, 921 (Ala. Civ.App.1998)).”
Ex parte A.S., 73 So.3d 1223, 1230 (Ala. 2011).
We conclude that, given the unique facts of this case, the juvenile court erred in determining that at the time of the termination judgment the evidence was clear and convincing that the mother was unable or unwilling to discharge her parental responsibilities and that her conduct or condition was unlikely to change in the foreseeable future. See § 12-15-319(a), Ala. Code 1975. In reaching our holding in this case, we note that we do not condone or minimize the significance of the mother’s conduct resulting in her arrest in December 2012 on DUI charges. It is with the evidence concerning that conduct that this court has struggled in reaching its holding in this appeal. However, after careful consideration, we believe that the mother should be afforded an opportunity to demonstrate whether that conduct was a onetime mistake in an otherwise excellent effort toward reunification or a return to a pattern of conduct that is destructive to her relationship with the child and his need for stability. In the circumstances of this case, the best interests of the child would be served by affording the mother that opportunity.
In so holding, we note that this court is simply holding that, at the time of the termination hearing, clear and convincing evidence did not demonstrate that the termination of the mother’s parental rights was in the child’s best interests. This court is not foreclosing the possibility that DHR might proceed, based on circumstances that have occurred during the pen-dency of this appeal or might occur after the release of this opinion, to again seek the termination of the mother’s parental rights if the mother’s situation and conduct deteriorate such that the child’s best interests would be served by the termination of her parental rights. See R.L.M.S. v. Etowah Cnty. Dep’t of Human Res., 37 So.3d 805, 808 (Ala.Civ.App.2009) (“[Wjhen deciding whether grounds to terminate parental rights exist, the juvenile court is not limited to evidence of current conditions; it may also consider the past history of the parent.”); T.D.K. v. L.A.W., 78 So.3d 1006, 1010 (Ala.Civ.App.2011) (“We have also held that the juvenile court may properly consider past history and present circumstances in a termination proceeding.”).
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.
DONALDSON, J., dissents, without writing.

. It appears that the mother's visitation was discontinued after the child returned to foster care after the DUI incident.