Rel: September 27, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2024

---

## CL-2024-0177

---

### Z.P.

### v.

### Mobile County Department of Human Resources

### Appeal from Mobile Juvenile Court
### (JU-18-352.05)

MOORE, Presiding Judge.

Z.P. ("the father") appeals from a judgment entered by the Mobile Juvenile Court ("the juvenile court") terminating his parental rights to L.P. ("the child"). We affirm the juvenile court's judgment.

## Procedural History

On December 13, 2022, the Mobile County Department of Human Resources ("DHR") filed in the juvenile court a petition seeking to terminate the parental rights of the father and of A.F. ("the mother") to the child. A trial on the petition was commenced on August 18, 2023, and, after a continuance, was concluded on October 20, 2023.

On October 24, 2023, the juvenile court entered a judgment purporting to terminate the parental rights of the mother and of the father to the child. On October 31, 2024, the father filed a notice of appeal to this court; that appeal was assigned appeal number CL-2023-0815. On February 20, 2024, this court entered an order dismissing appeal number CL-2023-0815 because the judgment had not addressed DHR's claim for child support and, thus, was not a final judgment capable of supporting the father's appeal. Z.P. v. Mobile Cnty. Dep't of Hum. Res. (No. CL-2023-0815, Feb. 20, 2024).

On February 26, 2024, the juvenile court purported to enter a judgment disposing of the outstanding child-support claim. The father

filed a notice of appeal from that judgment,[1] which was docketed as appeal number CL-2024-0177, i.e., the present appeal. Upon initial review of the appeal, this court noticed that the February 26, 2024, judgment was entered before this court's certificate of judgment was issued in appeal number CL-2023-0815, making the judgment a nullity. See Raybon v. Hall, 17 So. 3d 673, 674 (Ala. Civ. App. 2009). This court reinvested the juvenile court with jurisdiction to reenter its judgment, and, on July 30, 2024, the juvenile court reentered its judgment ("the final judgment"), giving this court jurisdiction over the appeal. See Rule 4(a)(4), Ala. R. App. P. ("A notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after the entry and on the day thereof.").

## Issues

The father argues that the final judgment should be reversed because the record lacks evidence of grounds for termination, specifically, evidence that his current conditions prevent him from properly parenting the child. The father further asserts that the juvenile court did not

---

[1]The mother has not appealed the judgment terminating her parental rights to the child.

3

receive sufficient evidence of recent attempts to locate relatives to assume custody of the child as a viable alternative to termination of his parental rights.

Standard of Review

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" C.O. v. Jefferson Cnty. Dep't of Hum. Res., 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly … establish the fact sought to be proved.'
>
> "KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [ (Ala. Civ. App. 2006)].

4

> "… [F]or trial courts ruling … in civil cases to which a clear-and-convincing-evidence standard of proof applies, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden[,]' [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986)]; thus, the appellate court must also look through a prism to determine whether there was substantial evidence before the trial court to support a factual finding, based upon the trial court's weighing of the evidence, that would 'produce in the mind [of the trial court] a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion.'"

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

The Evidence

The father testified that he and the mother began a dating relationship in July 2016 and that, within a few months, they began to cohabitate. The mother became pregnant, and, on October 16, 2017, the

5

child was born. On March 13, 2018, DHR received a report that the parents had taken the child to the hospital with serious injuries. The father testified that, on the day the child was injured, he had been caring for the child while the mother was at work. He admitted that he had injured the child by "aggressively" placing the child into his bassinet. The father "instantly" recognized that the child was having medical issues due to swelling on the side of the child's head. The father contacted the mother by telephone and informed her that the child had been injured and that she should come home right away. He did not initially inform the mother of the circumstances that had led to the child's injuries. Upon the mother's arrival at home, she and the father transported the child to the USA Women's and Children's Hospital. According to the father, on the day he injured the child, he "was on steroids," "was alone," had "had little sleep," and was "a new parent." He admitted that he had failed to "control his actions," but he blamed his lack of self-control on the "mind-altering" effects of the steroids he had injected.

The mother testified and confirmed that she had received a telephone call from the father informing her that the child had been injured and that she needed to come home. According to the mother,

6

when she arrived home, she observed swelling to the left side of the child's head along with bruising on his lips and his neck. She confirmed that she and the father had transported the child to the hospital.

The father initially informed the mother that the child had injured himself when he rolled off an ottoman when the father was changing his diaper. The mother questioned the veracity of the father's initial explanation considering the extent of the injuries the child had sustained. Three days into the child's hospital stay, the mother spoke with the father, expressing her concern for the truthfulness of his explanation regarding the child's injuries and asking that he share with her what had really happened. According to the mother, the father admitted to her that he had "body slammed [the child] in the bassinet of the pack and play." Following the father's admission, the mother testified that she informed the hospital staff of the father's actions that had resulted in the child's injuries. Thereafter, DHR filed for and received emergency custody of the child.

While the child was still hospitalized, the father was arrested and charged with aggravated child abuse. After being incarcerated for approximately seven-and-a-half months, the father was released on

7

bond.  It is unclear what date the father was released, but the evidence establishes that, by the time he was released on bond, DHR had returned the child to the physical care of the mother.  Pursuant to the terms of his release, the father was prohibited from, among other things, having any contact with the child or the mother.  Despite those restrictions, the father testified that, immediately upon being released on bond, he walked from the jail to the mother's apartment, where, he said, he let himself in with his key.  When asked why he had re-established contact with the mother in violation of his terms of release, the father testified that, when he was in jail, "things [had been] going positive because [he] was away from alcohol … and away from all the mind-altering substances."  The father's sobriety, however, was short lived.

Approximately one week after the father's release on bond, the child was again removed from the mother's custody because of the father's presence in the mother's home.  The father testified that he resumed consuming alcohol thereafter.  According to the father, alcohol helped relieve his depression. Despite the relief that alcohol provided, the father testified that, once he started consuming alcohol again, "things went south relatively quickly," which, he said, had resulted in his arrest on

March 1, 2019, for domestic violence after he assaulted the mother by strangling her. According to the father, on the day he was arrested for strangling the mother, he and the mother were drinking alcohol while they were babysitting the mother's nephews. The father testified that he had "consumed way too much alcohol way too quickly," and that, at some point, he had "blacked out." The father testified that he did not remember anything that had happened after he blacked out, until, he said, the police were knocking on the door.

The mother disputed the father's testimony indicating that she had been drinking alcohol while she and the father were babysitting her nephews. She testified that she had taken only one "shot" and that she had been "very sober minded." According to the mother, the conflict between her and the father had begun when she denied the father's request to take one of her nephews to the corner store to get a snack. She testified that she had denied that request because the father had been drinking and it had been the boy's bedtime. The mother testified that an argument ensued between her and the father outside the home, which, she said, resulted in the father's pushing her to the ground and his choking her and pulling her hair. The mother was able to make it back

inside the house but was again met by the father, who, the mother said, "strangled" her until she lost consciousness. When she regained consciousness, the mother contacted the police. The mother testified that, following that incident, she sought and received a permanent protection-from-abuse ("PFA") order against the father. It is unclear from the record if the PFA order also prohibited the father from contacting the child. The mother testified that, despite the entry of that PFA order, she had continued to contact the father.

Following his arrest for domestic violence on March 1, 2019, the father's bond on the aggravated child-abuse charge was revoked, and he was returned to jail. On May 8, 2019, the father pleaded guilty to the felony charge of aggravated child abuse; he was sentenced to 15 years in prison and was ordered to have no contact with the child. As a result of the March 1, 2019, strangulation incident, the father also pleaded guilty to "Domestic Violence Strangulation/Suffocation" and was sentenced to 15 years in prison; that sentence was to run concurrently with the 15-year sentence he received on the aggravated child-abuse charge. According to the father, when he was incarcerated, he availed himself of services that were offered for self-improvement, including a substance-

abuse program, classes in anger management, domestic-violence classes, and a stress-management program, among others.

The father, who had been released from prison 10 days before the first day of trial, testified that he had family members who were willing to provide care for the child but that those family members did not understand the situation or the process and were under the mistaken belief that his parental rights had already been terminated. He stated that his family members would not listen to him and, thus, he said, DHR would have to contact them to educate them on the process of pursuing consideration as a placement for the child. The father did not identify which paternal relatives he believed were willing or capable of providing for the child's care. None of the child's paternal relatives had maintained contact with the child.

The child's foster mother, S.P., testified that she and her husband G.P., the foster father, had been married for almost 20 years. The foster parents had two children, who, at the time of the termination trial, were ages 15 and 17 years. The foster mother is employed as a high-school teacher, and the foster father is employed as an electrical engineer. She testified that the child was first placed in their home on April 10, 2018,

and that, absent a five-month period when the child was unsuccessfully returned to the mother's custody, the child had been exclusively in their care. While in the foster parents' care, the child had begun kindergarten and was involved in extracurricular activities, including karate. According to the foster mother, the child had adapted well in their home and was "perfectly happy being there." The foster mother testified that they want to adopt the child.

Jasmine Patterson testified that she had been the DHR caseworker for the child since February 2023. According to her, on December 17, 2018, DHR had conducted a search to locate the child's paternal relatives. That search identified five individuals, who, Patterson said, DHR had contacted by mail on December 28, 2018. According to Patterson, in the six months that she had been the child's caseworker, no relatives had contacted her or DHR seeking custody of the child. She provided no evidence regarding potential contact that any of those five individuals might have had with the seven DHR social workers who had been assigned to the child's case before her. Patterson testified that, on October 28, 2022, the goal of the child's permanency plan was changed to adoption by current foster parents.

12

Following Patterson's testimony, DHR rested its case. At that time, the mother's counsel indicated that she wished to call one witness. Due to time constraints, the juvenile court set the trial to resume on October 20, 2023. When the termination trial resumed on that date, neither the mother nor the father appeared. According to his attorney, the father was on a probationary period with his employer and had been unable to secure time off to attend the second day of the termination trial. Despite that conflict, the father did not file a motion seeking a continuance of the October 20, 2023, trial date. Additionally, according to the mother's attorney, following the first day of the termination trial, the mother had decided to voluntarily consent to her parental rights being terminated. The mother's attorney presented a copy of a consent to termination that had been executed by the mother, which was admitted as a trial exhibit. Additionally, DHR admitted as an exhibit, without objection, visitation logs that had been prepared by the foster parents that showed when the mother had visited with the child. No witnesses were called to testify on the second date of the trial on October 20, 2023.

## The Findings of Fact

In the final judgment terminating the father's parental rights, the juvenile court found, in pertinent part:

"The Court previously heard testimony on August 18, 2023[,] and proceeded with the conclusion of testimony on October 20, 2023[,] and accepted all evidence relevant and material to the petition and considered all exhibits which were properly authenticated and admitted.

"....

"On the basis thereof, the Court does find from clear and convincing evidence, competent, material, and relevant in nature the following:

"1.   That the aforementioned child is under the age of 18 years and is within the geographical bounds of Mobile County, Alabama.

"....

"3.   Service of Process was perfected on the father, [Z.P.], by personal service at Elmore Correctional Facility on December 20, 2023.

"4.   That the father signed an acknowledgment of paternity at the birth of the child ... and the father is listed on the child's birth certificate.

"5.   That the child was first in [DHR] custody in March 2018 when the child had unexplained injuries. The father plead[ed] guilty to child abuse regarding this child on May 8, 2019[,] and was sentenced to

15 years .... The father was released on parole ten (10) days prior to the first hearing.

"6.   That the child was returned to the mother's custody in September 2018 but was again removed by [DHR] in October 2019 when it was discovered that the mother was allowing the father contact with the child.

"7.   That [DHR] was relieved of reasonable efforts with respect to the father on May 5, 2023[,] after the father committed said felony assault which resulted in serious bodily injury to the child. ...

"....

"11.  The permanency goal for the child has been adoption by current foster parent since October 28, 2022. The petition was filed December 14, 2022. ...

"....

"13.  That there are no viable relatives known to the Court or [DHR] to take care, custody, or control of the child.

"a.   [DHR] conducted a federal parent locator search for the mother and father and mailed letters to possible relatives with no response....

"....

"....

"15.  That the child was placed with the current foster parents in April of 2018 for two months and then again with the current foster parents in November

15

> of 2018 where the child is currently placed. The current foster parents and their two biological children are very bonded with the child. The child is well taken care of by the current foster parents who want to adopt the child. The permanency goal for the child has been adoption by current foster parent since October 28, 2022."

Based on the above findings of fact, the juvenile court found, among other things, that there was clear and convincing evidence, competent, relevant, and material in nature that the father was not willing or able to discharge his responsibilities to and for the child; that there were no viable alternatives to termination of the father's parental rights; that no potential relative resources were available for the permanent placement of the child; and that adoptive resources had been identified for the child.

Analysis

We first address the father's argument that the final judgment was not based on evidence of his current conditions or conduct. Section 12-15-319(a), Ala. Code 1975, a part of the Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-301 et seq., provides, in pertinent part:

> "If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[] of a child [is] unable or unwilling to discharge [his or her]

16

responsibilities to and for the child, or that the conduct or condition of the parent[] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[]."

Because the statutory grounds for termination of parental rights are phrased in present and future terms, the juvenile court was required to base its decision to terminate his parental rights on the father's current circumstances. See T.W. v. Shelby Cnty. Dep't of Hum. Res., 293 So. 3d 386 (Ala. Civ. App. 2019). That does not mean, however, that past circumstances have no bearing on the determination whether a parent can currently provide care for a child. Id.

Section 12-15-319(a)(4) specifically requires a juvenile court to consider the fact that a parent has been convicted of, and imprisoned for, a felony, even if the imprisonment has ended. See J.L. v. State Dep't of Hum. Res., 961 So. 2d 839, 849, & 849 n.3 (Ala. Civ. App. 2007). Furthermore, the AJJA specifically requires DHR to petition to terminate the parental rights of a parent who has committed a felonious assault on his or her child resulting in serious bodily injury. See Ala. Code 1975, § 12-15-317(1)f. The legislature obviously considers a conviction and imprisonment for the felonious assault upon a child such

a grave offense that it compels immediate consideration for termination of parental rights. In M.J.C. v. G.R.W., 69 So. 3d 197, 208 (Ala. Civ. App. 2011), this court held that a juvenile court could rely exclusively on the conviction and imprisonment for five felonies to terminate the parental rights of a father. In this case, the father was convicted for aggravated child abuse regarding the child and for "domestic violence strangulation/suffocation" of the mother of the child. Those crimes, the latter of which was committed while the father was out of jail on bond for the former, bear even more directly and adversely on the ability of the father to properly parent the child than did the felonies at issue in M.J.C., which did not involve child abuse or domestic violence.

The father contends, however, that the juvenile court should have considered the strides he had taken to overcome his alcohol and steroid abuse, which he claims caused him to injure the child and the mother. However, the juvenile court was not required to believe that the father had committed aggravated child abuse against the child because of the father's alcohol and steroid abuse. There is no testimony indicating that the father was intoxicated at the time he assaulted the child. The record also contains no evidence indicating that his steroid use was of a nature

18

to predispose him to abusive conduct or to deprive him of control over his violent impulses. From the evidence, the juvenile court could have determined that the father was attempting to excuse his criminal misconduct by blaming his substance-abuse problem.

Furthermore, this court has often stated that "the question whether a parent has truly and completely rehabilitated so as to resume the custody of a child is a question of fact to be determined by the juvenile court." R.L.M.S. v. Etowah Cnty. Dep't of Hum. Res., 37 So. 3d 805, 811 (Ala. Civ. App. 2009). While incarcerated, the father completed a substance-abuse program, an anger-management program, domestic-violence classes, parenting classes, and a stress-management program. That evidence did not compel a finding that the father had overcome his violent nature, which had caused him to inflict harm upon the child, sufficiently to resume parenting the child. See R.D. v. Coffee Cnty. Dep't of Hum. Res., 204 So. 3d 425, 429 (Ala. Civ. App. 2016). Considering the totality of the evidence, especially the heinous nature of the crime committed by the father against the child, we cannot find that the juvenile court erred in its implicit finding that the father was not

19

completely rehabilitated so as to resume the custody of the child.  See R.L.M.S., supra.

Next, the father argues that the final judgment terminating his parental rights was not based on his current conditions or conduct because of the juvenile court's delay in entering the judgment.  In his brief to this court, the father cites A.P. v. Covington County Department of Human Resources, 293 So. 3d 892 (Ala. Civ. App. 2019), and C.P.M. v. Shelby County Department of Human Resources, 185 So. 3d 461 (Ala. Civ. App. 2015), in support of his argument.  His reliance on those cases, however, is misplaced.

In A.P. and C.P.M., the parents in those cases sought appellate review of judgments terminating their parental rights that were entered after delays of 10 months and 11 months, respectively.  In both of those cases, the parents filed postjudgment motions asserting that their circumstances had changed following the last day of trial, and they submitted evidence to support that assertion.  In the present case, the trial regarding the termination of the father's parental rights concluded on August 18, 2023; the trial court offered the father an opportunity to present evidence on October 20, 2023, but the father declined to present

any additional evidence. The initial judgment terminating the father's parental rights, although not a final judgment, was entered on October 24, 2023. The juvenile court did not delay in entering a judgment based on the father's current circumstances. The juvenile court did overlook the child-support claim, resulting in a delay in making the judgment final, but, unlike the parents in A.P. and C.P.M., the father did not file a postjudgment motion or otherwise provide to the juvenile court evidence of any alleged changes in his circumstances since the termination trial had concluded.

In his brief to this court, the father summarily asserts that it is "logical to conclude that [his] circumstances had changed during the six months that passed between his testimony on August 18, 2023, and the date of the final judgment ...." The father's brief, p. 22. The father failed, however, to make any similar argument to the juvenile court. It is well established that "[t]his court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992). Accordingly, we will not address this issue further.

The father next argues that the juvenile court failed to exhaust viable alternatives to the termination of his parental rights. According to the father, DHR failed to discharge its duty to make reasonable and recent efforts to locate relative resources to assume custody of the child in compliance with A.R.H.B. v. Madison County Department of Human Resources, 378 So. 3d 543 (Ala. Civ. App. 2022).

In A.R.H.B., the mother sought appellate review of a judgment terminating her parental rights to her child. 378 So. 3d at 549. On appeal, she argued, among other things, that the juvenile court in that case had erred in determining that the Madison County Department of Human Resources ("the Department") had presented sufficient evidence indicating that it had made a recent and sufficient search for relative resources, i.e., for viable alternatives to termination. Id. This court found that the entirety of the evidence regarding the Department's efforts to locate relative resources was limited to the Department's attorney asking the child's social worker only if certain relatives had contacted the Department, and the social worker's response that three had not and that the Department had rejected a fourth relative as being an unsuitable placement. Id. The evidence showed that the mother in

22

that case had not been willing to place the child at issue with the maternal grandmother or the maternal great-grandmother as an initial safety-plan placement but that the Department had failed to present evidence concerning the mother's reason for that refusal, had failed to present evidence regarding any further contacts that the Department might have had with those maternal relatives, had failed to present any evidence regarding whether the Department had asked the mother and the father to provide a list of names of possible relatives with whom the child might be placed, had failed to present evidence indicating that the Department had investigated any relatives that the mother and the father might have identified, and had failed to present evidence that the Department had sought to, or were able to, identify other relative placements for the child. <u>Id.</u> at 550. This court specifically noted that the Department had also failed to present evidence indicating whether, or when, any relative of the parents had become aware of the child's having been placed in foster care such that § 12-15-319(c) might be implicated. This court reversed the termination judgment in that case based upon the Department's failure to present sufficient evidence

indicating that it had properly investigated viable alternatives to the termination of the mother's parental rights. Id. at 551.

In this case, the undisputed evidence established that DHR had searched for, had identified, and had contacted all known paternal relatives by letter. Those letters informed the relatives that "a possible relative" of the recipient was, at that time, in foster care, and the letters further provided contact information and instructions "in the event the recipient was interested in obtaining more information regarding [the child]." The paternal relatives implicitly declined to care for the child by failing to respond to the letters. The father testified that the paternal relatives were aware that the child had been removed from his custody and had been placed in foster care, yet they had not sought custody of the child.

Section 12-15-319(c) provides:

"The juvenile court is not required to consider a relative to be a candidate for legal guardian of the child in a proceeding for termination of parental rights if both of the following circumstances exist:

"(1) The relative did not attempt to care for the child or obtain custody of the child within four months of the child being removed from the

24

custody of the parents or placed in foster care, if the removal was known to the relative.

"(2) The goal of the current permanency plan formulated by the Department of Human Resources is adoption by the current foster parents."

Section 12-15-319(c) vests a juvenile court with the discretion to disregard a relative as a potential custodian of the child under the enumerated circumstances.

Unlike in A.R.H.B., we find that § 12-15-319(c) is implicated in this case. Under § 12-15-319(c), the juvenile court had the discretion to refuse to consider the unnamed paternal relatives as potential custodians for the child and the placement of the child with a paternal relative as a viable alternative to the termination of the father's parental rights. The juvenile court exercised its discretion accordingly. The father contends that placement with paternal relatives should have been considered because the paternal relatives allegedly were confused as to the procedure to follow to assert themselves as potential relative placements. However, we cannot say that the juvenile court abused its discretion in implicitly determining that the alleged confusion of the paternal relatives was an insufficient excuse for their failure to even contact DHR or come

25

forward in some manner after learning of the plight of the child. Considering the applicability of § 12-15-319(c), we conclude that the juvenile court did not err in refusing to require DHR to restart its search for a relative placement and that it acted within its discretion when it determined that no viable alternative to the termination of the father's parental rights existed.

Conclusion

Because the father has failed to raise an argument on appeal that merits reversal of the final judgment terminating his parental rights, that judgment is affirmed.

AFFIRMED.

Hanson, Fridy, and Lewis, JJ., concur.

Edwards, J., concurs in the result, without opinion.